ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
     – and –
DAVID T. WISSBROECKER (243867)
DANIELLE S. MYERS (259916)
MAXWELL R. HUFFMAN (264687)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com
dmyers@rgrdlaw.com
mhuffman@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. GOLUB, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> GIGAMON INC., et al., <br><br> Defendants. | Case No. 3:17-cv-06653-WHO <br><br> LEAD PLAINTIFF'S OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS <br><br> DATE:      January 30, 2019 <br> TIME:      2:00 p.m. <br> CTRM:      2, 17th Floor |

1507934_1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. SUMMARY OF ALLEGATIONS .........................................................................2

III. STANDARD OF REVIEW .....................................................................................5

IV. ARGUMENT ...........................................................................................................6

    A. Plaintiff Properly States a Claim for Violations of §14(a) ...........................6

        1. The Complaint Properly Alleges Negligence ...............................7

        2. The Complaint Properly Alleges an Omissions-Based Claim Under *Omnicare* ..................................................................................8

    B. The Complaint Adequately Alleges a *Virginia Bankshares* Material Misrepresentation Claim ..........................................................................12

    C. Defendants' Counterfactual Arguments Are Premature and Improper on a Motion to Dismiss .....................................................................................16

    D. The PSLRA's Safe Harbor for Forward-Looking Statements Does Not Insulate Defendants' Present Statements About the Suitability of the Projections They Based Their Recommendation to Shareholders On ..................19

V. THE COMPLAINT ALLEGES A §20(a) CLAIM ...........................................22

    A. The Gigamon Defendants Concede Control .........................................22

    B. The Elliott Defendants' Attempt to Challenge Control Fails ...............23

VI. CONCLUSION.........................................................................................24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Azar v. Blount Int'l Inc.*,
  2017 WL 1055966 (D. Ore. Mar. 20, 2017) ...............................................7, 16, 17

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) ........................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................5

*Bell v. Cameron Meadows Land Co.*,
  669 F.2d 1278 (9th Cir. 1982) ...................................................................18

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .......................................................................7

*Brown v. Brewer*,
  2010 WL 2472182 (C.D. Cal. June 17, 2010) .......................................7, 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .................................................................11, 16

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)...........................................................8, 9

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016) .............................................9

*Hufnagle v. Rino Int'l Corp.*,
  2013 WL 3976833 (C.D. Cal. Aug. 1, 2013) .............................................16

*In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.*,
  431 F.3d 36 (1st Cir. 2005)..........................................................................16

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ....................................................................20

*In re Hot Topic Inc. Sec. Litig.*,
  2014 WL 7499375 (C.D. Cal. May 2, 2014) ................................... *passim*

*In re Maxim Integrated Prods.*,
  574 F. Supp. 2d 1046 (N.D. Cal. 2008) ........................................................8

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...............................................................19, 20

1

2                                                                          **Page**

3

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964).................................................................................6

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994) ...............................................................23

*Kelley v. Rambus, Inc.*,
   2008 U.S. Dist. LEXIS 100319
   (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 F. App'x 570
   (9th Cir. 2010).......................................................................................7

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ...........................................................6

*Knurr v. Orbital ATK Inc.*,
   276 F. Supp. 3d 527 (E.D. Va. 2017) ..............................................16, 19

*Laborers' Local #231 Pension Fund v. Cowan*,
   2018 WL 3468216 (D. Del. July 18, 2018) ................................. *passim*

*Lane v. Page*,
   581 F. Supp. 2d 1094 (D.N.M. 2008) ...................................................24

*Mendell v. Greenberg*,
   927 F.2d 667 (2d Cir. 1990)..................................................................24

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)................................................................................7

*Montanio v. Keurig Green Mountain, Inc.*,
   276 F. Supp. 3d 212 (D. Vt. 2017)........................................................12

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................20

*NECA-IBEW Pension Trust Fund v. Precision Castparts*,
   2017 WL 4453561 (D. Ore. Oct. 3, 2017)
   *report and recommendation adopted*, 2018 WL 533912
   (D. Ore. Jan. 24, 2018)................................................................. *passim*

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................23

Page

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
 __U.S.__, 135 S. Ct. 1318 (2015) ................................................................. *passim*

*Podany v. Robertson Stephens, Inc.,*
 318 F. Supp. 2d 146 (S.D.N.Y. 2004) ...................................................................16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
 759 F.3d 1051 (9th Cir. 2014) ...............................................................................20

*Rodriguez v. Gigamon Inc.,*
 325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................................................................20

*SEC v. Todd,*
 642 F.3d 1207 (9th Cir. 2011) ......................................................................... 10, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007) ...............................................................................................16

*TSC Indus. v. Northway, Inc.,*
 426 U.S. 438 (1976) .......................................................................................6, 7, 24

*Virginia Bankshares Inc. v. Sandberg,*
 501 U.S. 1083 (1991) ..................................................................................8, 12, 13

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
 §77e ........................................................................................................................8
 §78n(a) ........................................................................................................... *passim*
 §78t(a) ................................................................................................... 1, 22, 23, 24

17 C.F.R.
 §230.405 .................................................................................................................24

Federal Rules of Civil Procedure
 Rule 12(b)(6) ........................................................................................................2, 6

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 73-1383 (1934) .............................................................................24

1  Lead Plaintiff John E. Golub ("Plaintiff") brings this putative class action in connection with

2  the sale of Gigamon and the dissemination of the Proxy Statement in violation of §14(a) and §20(a)

3  of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.[1]  Plaintiff respectfully submits this

4  omnibus memorandum in opposition to the motions to dismiss filed by Gigamon, the Director

5  Defendants and the Elliott Defendants (collectively, "Defendants").

6  **I.     INTRODUCTION**

7  Defendants' Motions[2] misconstrue Plaintiff's allegations in the Complaint, misapprehend the

8  law, and create improper factual disputes not resolvable until after full discovery on the merits.

9  Plaintiff is not alleging, as Defendants contend, that any of the various sets of financial projections

10  considered by the Gigamon Board were false or misleading.  Plaintiff is instead alleging that the

11  Board's opinions that the Merger was fair to shareholders, and that Gigamon's Updated Case C

12  Projections better reflected the operative reality of the Company at the time of Merger rather than its

13  Case B Projections, were materially misleading opinions because Defendants omitted material

14  information about Gigamon's financial results that cut the other way.

15  Under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __U.S.__, 135

16  S. Ct. 1318, 1332 (2015), Plaintiff is not required to demonstrate that either opinion was objectively

17  or subjectively false, as Defendants suggest.  All *Omnicare* requires is a material omission that

18  makes a statement of opinion materially misleading – even honestly held opinions can mislead.  The

19  Complaint meets this standard by alleging that the Board was in possession of financial results that

20  undermined its opinion of fairness, and its opinion of which set of financial projections to rely on, at

21  the time the Proxy Statement containing those opinions was disseminated to Gigamon shareholders.

22  But even if objective and subjective falsity were required to show the Board did not honestly hold its

23  opinions, the Complaint sufficiently alleges that as well.

24

25  [1]     Unless otherwise defined, all capitalized terms carry the same meaning as defined in the Consolidated Complaint for Violations of Securities Exchange Act of 1934 (the "Complaint") (ECF 56).  All references to "¶" and "¶¶" are citations to the Complaint.

26

27  [2]     "Motions" refers to the Gigamon Motion to Dismiss Consolidated Complaint for Violations of Securities Exchange Act of 1934 (ECF No. 69), and the Elliott Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint (ECF No. 65).

28

1   Beyond that, Defendants ask the Court to reject plausible inferences in the Complaint and

2 accept their implausible version of the financial results the Board had when the Proxy Statement was

3 issued.  Obviously, the Court cannot resolve factual disputes on a Rule 12(b)(6) motion; nor can it

4 assume Defendants' (implausible) version of events is true.  Defendants also seek protection within

5 the PSLRA "safe harbor" provision for forward looking statements – even though they concede that

6 the statements at issue were based on an assessment of the Company's then-current operative reality

7 not forward-looking.  Thus, the Motions should be denied on the substantive allegations and as to the

8 arguments that Defendants did not control issuance of the materially misleading Proxy Statement.

9   **II.     SUMMARY OF ALLEGATIONS**

10   Gigamon is the industry leader in traffic visibility solutions that enable companies to see data

11 traversing networks.  ¶2.  Gigamon is one of the fastest growing companies in the U.S., and recently

12 embarked on a number of new initiatives to prolong its growth trajectory.  ¶¶2, 53.  Gigamon ended

13 2016 with its second consecutive year of over 40% year-over-year revenue growth.  ¶56.  Gigamon's

14 management consistently touted its growth in press releases and conference calls, and in February

15 2017 confirmed management's view that 20% to 25% growth was achievable by the end of 2017

16 despite some slowdown in orders.  ¶¶57-69.

17   In March 2017, Elliott began surreptitiously accumulating a position in Gigamon.  ¶70.  A

18 few weeks later, Elliott made its position known to the Company and stated its intention to publicly

19 disclose its stake and put the Company in play.  ¶¶72-73.  Elliott's reputation as an aggressive

20 activist investor is well known, as are its attacks on public company boards.  ¶¶3, 72.  On May 8,

21 2017, Elliott publicly disclosed its 15.3% position in the Company and stated its intention to explore

22 strategic alternatives with the Company – a coercive threat to put the Company on a path to a sale.

23 ¶¶3, 73.  The announcement had the intended affect – an 18% stock run up which put the Company's

24 stock in the hands of arbitrageurs who would put pressure on the Board to sell.  ¶75.

25   Although Elliott generally just puts companies in play and then takes a profit when the stock

26 price jumps, here Elliott saw sufficient upside to engage in serious discussions about being the

27 acquirer.  ¶79.  The Board realized that a sale was a real possibility and tasked management to

28 update the Company's financial projections to be used in valuation analyses once a sale was under

consideration.  ¶114.  A few weeks later, Gigamon management presented the Board with three scenarios: (1) a stand-alone base case run-the-Company scenario, Case B; (2) an upside case, Case A; and (3) a downside case, Case C.  ¶83.

On June 2, 2017, Gigamon's stock price jumped again when existence of the nascent sales process was leaked to *Reuters*.  ¶84.  On June 5, 2017, Gigamon management again publicly confirmed a 20%-25% growth rate for 2017.  ¶85.

The next day, the Board met again to discuss the three sets of financial projections provided by management.  ¶76.  Consistent with Gigamon's public comments about growth of 20%-25%, the Board directed its financial advisor, Goldman Sachs to utilize the base case Case B projections in its financial analyses of any proposed merger.  *Id.*

With the Company now in play due to Elliott's press releases and the leak to *Reuters*, the Board formally initiated the inevitable sales process.  ¶88.  With the pressure from merger speculation in the Company's stock price, and the ever present inchoate threat of hostile activism from Elliott, the Board would soon back itself into a corner and make the decisions that would lead to this litigation.

On July 27, 2017, Gigamon publicly discussed its second quarter 2017 results, again confirming it expected to exit 2017 with 20%-25% growth rates, which it reiterated in presentations that highlighted its 40% growth rate in 2016.  ¶91.  On August 8, 2017, Gigamon again confirmed its anticipated growth rates for 2017, which were in line with the Case B Projections.  ¶99.

Meanwhile, the sales process was not producing a competitive bidding environment.  ¶101. Elliott was the only interested bidder, which meant it would be able to make a low-ball bid that the Board would feel compelled to accept because of market pressures.  *Id.*

Elliott's initial proposal came in at $42.50 per share.  ¶103.  The Board's initial reaction was that the bid was too low given the expected results for 2017, even as management was indicating that third quarter results may be lower than expected.  ¶104.  The Board maintained its view that the Case B Projections best represented the operative reality of the Company.  *Id.*  The pressure started to mount.

1  The next day, another leak made its way into the market, this time specifying Elliott as the

2  bidder.  ¶105.  Gigamon's stock price rose again, up to $44.40 per share – above Elliott's current

3  offer.  Analysts raised their price targets on the news, as high as $50 per share, and speculated that

4  Elliott was either just posturing to keep the Company in play, or looking to buy Gigamon below its

5  intrinsic value.  ¶106.  Even so, analysts still believed that Gigamon would fetch between $47-$60

6  per share in a sale.  *Id.*

7  Despite Gigamon's rising stock price, the Board decided to accept Elliott's proposal based on

8  some hedging by management about the third quarter results – Hooper expressed "optimism" about

9  the results, but noted some signs of "softening." ¶107.  With the market expecting a deal, however,

10  the Board did not want to subject itself to criticism if the third quarter results did not pan out and

11  there was no deal with Elliott in place.  ¶108.  Thus, the Board's focus turned from Gigamon's

12  intrinsic value to its market volatility, eschewing Gigamon's long-term value in an effort to hedge its

13  stock price for the short term.

14  When the softening in the quarter was confirmed and the results were shared with Elliott,

15  Elliott indicated that it would not be willing to adhere to its current bid.  ¶103.  Absent extraneous

16  pressure, the Board may have balked at a lower price.  But then another mysterious leak was

17  reported by management – *Reuters* was planning to run an article disclosing that Elliott was

18  withdrawing because the Board's expectations were too high.  ¶105.  With the double market

19  pressure of deal speculation and the looming third quarter miss, the Board caved.  ¶¶114-123.

20  The next day, Elliott lowered its bid to $38 per share.  ¶113.  Desperate to sign a deal, and

21  cognizant of the fact that the Case B Projections would not support a deal at $38 per share, the Board

22  inexplicably and without any factual basis decided that the original Case B Projections could not be

23  relied upon.  ¶114.

24  The Board's initial response was logical – they asked that management provide a refreshed

25  set of Case B projections that adjusted for the second and third quarter.  ¶117.  But that adjustment

26  was insufficient to lower the value to the range of Elliott's current proposal.  ¶¶117-118.  What was

27  necessary to justify agreeing to Elliott's bid was completely abandoning the Company's operating

28  plan in favor a near-zero growth model – the Updated Case C projections.  *Id.*  Unable to secure any

1   more than a $0.50 raise in price from Elliott, the Board directed Goldman Sachs to utilize the

2   Updated Case C projections in its fairness analysis.  ¶¶120-121.  On October 27, 2017, after

3   Goldman Sachs offered its fairness opinion, based on the Updated Case C Projections, the Board

4   approved the Merger.  ¶123.

5        The "softening" in the third quarter proved to be an anomaly.  ¶120.  Gigamon would end the

6   year with a record close, buoyed by the fourth quarter results.  *Id*.

7        On November 24, 2017, Defendants issued the Proxy Statement.  ¶126.  The Proxy Statement

8   included the Board's opinion that the Merger was fair, based in part on Goldman Sachs' fairness

9   opinion, which was anchored in the Updated Case C Projections.  ¶¶128-130.  The Proxy Statement

10   also included the Board's opinion that the Updated Case C Projections, and not the Case B

11   Projections, were the most appropriate to use in assessing Gigamon's current operations and

12   expected future results.  *Id*.  The Proxy Statement did not disclose that Gigamon was experiencing a

13   record close to 2017, which would have called into question both of these opinions by the Board.

14   ¶131.  Three subsequent communications were disseminated to Gigamon shareholders on December

15   4, 11, and 12, 2017, including a supplement to the Proxy Statement.  None of the communications

16   disclosed Gigamon's record close to 2017.  *Id*.

17        Gigamon shareholders voted in favor of the Merger on December 22, 2017, and the Merger

18   closed on December 27, 2017, making Elliott its sole shareholder.  ¶¶127, 148.  On May 3, 2018,

19   Gigamon issued a press release announcing that "Gigamon is off to a strong start in the first quarter,

20   building on the record-setting close we had in 2017."  ¶12.

21   **III.    STANDARD OF REVIEW**

22        This court must deny a motion to dismiss when plaintiff's factual allegations "raise a right to

23   relief above the speculative level, . . . on the assumption that all the allegations in the complaint are

24   true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[A] well-

25   pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

26   improbable, and 'that a recovery is very remote and unlikely.'"  *Id.* at 556.[3]

27

28   [3]      Unless otherwise noted, all emphasis is added, and citations and footnotes are omitted.

1      Unlike Rule 12(b)(6) motions to dismiss other securities claims, motions to dismiss §14(a)

2  claims are more difficult to sustain because the claim involves unique materiality determinations that

3  require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given

4  set of facts and the significance of those inferences to him, and these assessments are peculiarly ones

5  for the trier of fact." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  As such, "in view of

6  the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within

7  management's control, it is appropriate that [any] doubts [as to the critical nature of information

8  misstated or omitted] be resolved in favor of those the statute is designed to protect [*i.e.*, plaintiff and

9  other stockholders]." *Id.* at 448.

10     Although the PSLRA pleading requirements apply to §14(a) claims, "unlike Section 10(b),

11  Section 14(a) 'lacks any reference to a "manipulative device or contrivance . . . to indicate a

12  requirement of scienter.""" *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005).

13  "Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a) for both

14  forward looking and non-forward looking statements." *Id.* at 682-83.  The "strong inference"

15  pleading standard of the PSLRA does not apply to negligence because "negligence is not a state of

16  mind." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009).  Even if Rule 9(b) applied here, and it

17  does not, Defendants make no argument that the requisite who, what, when, where, and how are not

18  pleaded.

19  **IV.     ARGUMENT**

20          **A.      Plaintiff Properly States a Claim for Violations of §14(a)**

21     The "purpose of [§]14(a) is to prevent management or others from obtaining authorization for

22  corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co.*

23  *v. Borak*, 377 U.S. 426, 431 (1964).  To state a §14(a) claim "a plaintiff must establish that '(1) a

24  proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff

25  injury and (3) that the proxy solicitation, [rather than the particular defect in the solicitation

26  materials], was an "essential link in the accomplishment of the transaction.""" *Knollenberg*, 152 F.

27  App'x at 682.

28

The Gigamon Defendants only challenge the first element concerning whether there were material misrepresentations or omissions. *See* ECF No. 69.  The Supreme Court has held that an "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC*, 426 U.S. at 449.  A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  As demonstrated in the Complaint and discussed herein, Plaintiff meets all required pleading standards associated with this element, and Defendants have not shown that any potential affirmative defenses support dismissal of Plaintiff's claims at this preliminary stage.

**1.      The Complaint Properly Alleges Negligence**

"Use of a solicitation," *i.e.*, proxy statement, "that is materially misleading is itself a violation of law." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970).  "'As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence standard.'" *Brown v. Brewer*, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010) ("'Liability can be imposed for negligently drafting a proxy statement.'"); *Azar v. Blount Int'l Inc.*, 2017 WL 1055966, at *9 (D. Ore. Mar. 20, 2017) ("The requisite level of culpability, or mental state, for a claim under §14(a) is negligence."); *Kelley v. Rambus, Inc.*, 2008 U.S. Dist. LEXIS 100319, at *24 (N.D. Cal. Dec. 9, 2008) (finding that, if plaintiff could sufficiently allege a material misstatement, the Complaint adequately alleged a "strong inference of Defendants' negligence" where the Individual Defendants "were directors at the time the 2005 proxy statement was released" and "the representations therein can be attributed to these defendants"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).

Here, the Complaint easily meets this test by alleging that each Director Defendant was a member of Gigamon's Board when the Proxy Statement was disseminated, had the opportunity to review and edit the Proxy Statement, recommended that shareholders vote in favor of the Acquisition, and gave the purported reasons why Gigamon's Board believed the Acquisition and the Acquisition price was fair to and in the best interests of Gigamon's stockholders. *See* ¶¶20, 22-30, 143-145.  No more is required to adequately plead negligence for §14(a) claims, as the Gigamon

1   Board was "at least negligent" in preparing and issuing the materially misleading Proxy Statement.

2   *In re Maxim Integrated Prods.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) (denying motion to

3   dismiss as to §14(a) claims).

### 2.    The Complaint Properly Alleges an Omissions-Based Claim Under *Omnicare*

The Complaint alleges in extensive detail how the omission of material information about

Gigamon's current and anticipated financial results rendered at least two opinions that the Board

offered materially misleading: (a) the Board's opinion that the Merger was "fair" to Gigamon

shareholders, which rested in part on Goldman Sachs' fairness opinion, which in turn rested on the

Updated Case C Projections (¶29); and (b) the Board's statement that "the Case B projections over-

stated Gigamon's long-term prospects. . . . [and] that the [Updated] Case C Projections appeared to

reflect a better estimate of Gigamon's long-term prospects." ¶130(d).  The Board had material facts

in their possession that, if disclosed, would have "call[ed] into question the [Board's] basis for

offering [both] opinion[s]." *Omnicare*, 135 S. Ct. at 1332.[4]  "If the directors of Company X tell their

shareholders that a proposed merger offers a 'fair' price for Company X's shares, they have stated

their opinion about the deal." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp.

3d 48, 70 (S.D.N.Y. 2015).

When pleading such a claim under *Omnicare*, stockholders are to "call into question the

issuer's basis for offering the opinion" by "identify[ing] particular (and material) facts going to the

basis for the issuer's opinion – facts about the inquiry the insurer did or did not conduct or the

knowledge it did or did not have – whose omission makes the opinion statement at issue misleading

to a reasonable person reading the statement fairly and in context."  135 S. Ct. at 1332; *Virginia*

*Bankshares*, 501 U.S. at 1090-91 (recognizing liability for an false and misleading opinion that the

---

4       Although *Omnicare* involved claims under §11 of the Securities Act of 1933, it likewise applies to proxy claims under §14(a).  Notably, *Omnicare* relied on the Supreme Court's approach in a case brought under §14(a).  *See Omnicare*, 135 S. Ct. at 1326 n.2 (noting that §14(a) "bars conduct similar to that described in §11") (citing *Virginia Bankshares Inc. v. Sandberg*, 501 U.S. 1083, 1091-96 (1991)).  In addition, the "omissions clause" of Rule 14a-9 ("which omits to state any material fact necessary in order to make the statements therein not false or misleading") is nearly identical to the "omissions clause" of §11 ("or omitted to state a material fact . . . necessary to make the statements therein not misleading").  *Id.*

1    merger "provides an opportunity for the Bank's public shareholders to achieve a high value for their

2    shares").  For disclosures affecting a statement of opinion, "literal accuracy is not enough: An issuer

3    must as well desist from misleading investors by saying one thing and holding back another."

4    *Omnicare*, 135 S. Ct. at 1331.  "[A] reasonable investor may, depending on the circumstances,

5    understand an opinion statement to convey facts about how the speaker has formed the opinion – or,

6    otherwise put, about the speaker's basis for holding that view." *Id.* at 1328.  "And if the real facts

7    are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 1322.

8           For example, in *MetLife*, plaintiff alleged that an insurance company omitted facts necessary

9    to prevent its opinion regarding the sufficiency of the company's death-benefit reserves from being

10   misleading.  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2016 WL 6652731, at *10

11   (S.D.N.Y. Nov. 10, 2016).  Plaintiff alleged that defendant conducted a cross-check for the reserves

12   that supported a potential shortfall and that called into question the basis for its opinion. *Id.* at *11.

13   In finding that plaintiff properly stated a claim, the court explained that "MetLife omitted to state

14   material facts rendering its implicit statements about the adequacy of its . . . reserves misleading.

15   The $25 million short alleged 'call[s] into question' MetLife's basis for offering its opinions because

16   it suggests that MetLife's statements did not 'fairly align . . . with the information in . . . [its]

17   possession at the time' – namely that its method for identifying [death benefit] claims and setting its

18   reserves was inaccurate." *Id.* at *10.

19          The *Omnicare* standard, which Defendants ignore, is squarely implicated here.  Both

20   statements in question are undoubtedly opinions – the Board opined that the Merger was fair, and

21   opined that the Updated Case C Projections better reflected Gigamon's current operative reality.

22   *See, e.g.*, *Laborers' Local #231 Pension Fund v. Cowan*, 2018 WL 3468216, at *3 (D. Del. July 18,

23   2018) (analyzing §14(a) claims related to the board's opinions regarding the merger and financial

24   projections under *Omnicare*).  In support of both statements, the Board thought it material to support

25   both opinions by pointing to "Gigamon's recent performance." *See* ¶130(d).  But what was omitted

26   from the Proxy Statement was that, by the time the Proxy Statement was disseminated on November

27   24, 2017, Gigamon's performance had markedly improved – leading to a "record breaking close to

28   2017." ¶¶131, 137.  Disclosure of a marked upturn in Gigamon's business would have "call[ed] into

1    question the [Board's] basis for offering the opinion." *Omnicare*, 135 S. Ct. at 1331.  Without this

2    information, both opinions by the Board materially misled Gigamon's shareholders.[5]

3        That Defendants may not have had this information in their possession when they agreed to

4    the Merger is irrelevant.  By the time the Proxy Statement was disseminated it was available – the

5    Proxy Statement makes clear that the Board was receiving near constant updates on results of

6    operations when in discussions with Elliott as the disappointing third quarter came to a close.  And

7    even if the information was inchoate at the time the Proxy Statement was first disseminated, the

8    Board could and should have updated its opinions as the information of the record close to the fourth

9    quarter came in.  ¶137.  Gigamon, in fact, twice urged shareholders to vote in favor of the Merger in

10   the weeks after the Proxy Statement was issued, and even supplemented the Proxy Statement on

11   December 12, 2017 in an ineffective attempt to scuttle this litigation.  ¶¶126, 137.

12       The materiality of this omission is underscored by the mountain of allegations in the

13   Complaint that detail that the Case B Projections were far more in line with how management

14   expected Gigamon to actually perform in the foreseeable future.  The Complaint details how

15   Gigamon had consistently met or exceeded management's projections (¶¶51-69), Gigamon

16   management, including Defendants Hooper and Jackson, had consistently touted the Company's

17   success and reliable growth prospects throughout 2017 and publicly expressed zero doubts about the

18   Company's ability to meet management's expectations (¶¶12, 56-57, 65, 68, 78, 81, 91-92, 99), and

19   analysts relied on Defendants' public statements to value Gigamon between $42-$50 per share.  ¶¶4,

20   131.  These allegations demonstrate that the financial results Gigamon was experiencing at the time

21   the Proxy Statement was disseminated were not an outlier but consistent with past and expected

22   future performance.  These allegations also demonstrate that the weakness in third quarter that the

23

24

25   [5]      It is axiomatic in the Ninth Circuit that "[i]nformation regarding a company's financial condition is material to investment" and "how officers and directors of a public corporation describe

26   revenue growth to investors is important." *SEC v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011).  And, while "[a] company has no duty to include 'speculative financial predictions' in a proxy," "if a Proxy

27   discloses valuation information, it must be complete and accurate." *Brown*, 2010 WL 2472182, at *20-*21 (finding stockholders "would have wanted to independently evaluate management's internal

28   financial projections to see if the company was being fairly valued").

1  Board pointed to in justification for its opinions ***was*** an outlier, reinforcing the materiality of the

2  omission of current results.

3        *Omnicare* itself provides a supportive hypothetical: if an issuer publicly stated, "'[w]e

4  believe our conduct is lawful,'" but did not disclose the issuer's knowledge that the Federal

5  Government took the opposite view, reasonable investors would be misled because the issuer's

6  opinion would not "fairly align[] with the information in the issuer's possession at the time." 135 S.

7  Ct. at 1328-29.  Like in *Omnicare*'s hypothetical, the Board's opinions here about the fairness of the

8  merger and which projections best reflected Gigamon's operative reality did not "fairly align[] with

9  the information in [defendants'] possession at the time."  *Id*. at 1329.  The Board's opinion

10  statements also "'affirmatively create[d] an impression of a state of affairs that differs in a material

11  way from the one that actually exist[ed].'"  *In re Hot Topic Inc. Sec. Litig.*, 2014 WL 7499375, at

12  *10 (C.D. Cal. May 2, 2014).

13        The Gigamon Defendants do not address Plaintiff's *Omnicare* claims, in part because they

14  misconstrue the Complaint's allegations, and in part because they misapprehend the appropriate

15  legal framework.  The Gigamon Defendants argue that the Complaint fails to sufficiently allege the

16  falsity of the Updated Case C projections themselves (ECF No. 69 at 15-20), but Plaintiff's claims

17  are not premised on the "falsity" *per se* of any set of financial projections.  Rather, Plaintiff alleges

18  that the Board's opinion statements about the Merger's fairness, which is based in part on the

19  Updated Case C Projections, and about which set of financial projections better reflected the current

20  operative reality of the Company, were materially misleading by omission.  ¶¶128-148.  Plaintiff's

21  claims are focused on the Board's opinion statements – not whether any set of projections were

22  "false."

23        As the Complaint alleges an *Omnicare* claim, the Gigamon Defendants' arguments about the

24  need to plead objective and subjective falsity are misdirected.  Objective and subjective falsity are

25  not required to support an *Omnicare* claim.  *City of Dearborn Heights Act 345 Police & Fire Ret.*

26  *Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (explaining that "*Omnicare* articulated a

27  different method for pleading falsity under an omissions theory of liability").  All *Omnicare* requires

28  is that the Complaint alleges that the Proxy Statement "'omits material facts about the issuer's

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS - 3:17-cv-06653-WHO - 11 -

1   inquiry into or knowledge concerning a statement of opinion,'" and "'those facts conflict with what a

2   reasonable investor would take from that statement itself.'"  *Id.*  As set forth in *Omnicare*, a stated

3   belief that is honestly held can still be misleading if it omits a material fact.  135 S. Ct. at 1331

4   (holding that defendants must "desist from misleading investors by saying one thing and holding

5   back another").[6]

6          For these reasons, Plaintiff has properly pled a §14(a) claim under *Omnicare*, and the

7   motions to dismiss should therefore be denied.

8      **B.    The Complaint Adequately Alleges a *Virginia Bankshares* Material
              Misrepresentation Claim**
9
10         Even if Plaintiff's allegations concerning Defendants' statements of opinion and belief – that

11   the Updated Case C Projections best reflected Gigamon's operative reality at the time of the Merger,

12   and the consideration paid to shareholders was financially fair –  are treated as false statements,

13   rather than as a statement made misleading by omission under *Omnicare*, Plaintiff adequately states

     a §14(a) claim.
14
15         In *Virginia Bankshares*, the Supreme Court explained that directors' statements of opinion

16   and belief can be demonstrated to be false because they are "factual in two senses: as statements that

17   the directors do act for the reasons given or hold the belief stated and as statements about the subject

18   matter of the reason or belief expressed." 501 U.S. at 1092.  The Court held that such statements are

19   "knowingly false or misleadingly incomplete" if they are false in both senses.  *Id.* at 1095-96.  In

20   other words, such statements are actionable false statements if they are subjectively false – *i.e.*, they

21   "misstate[] the actual opinions, beliefs, or motivation of the speaker" – and if they are objectively

22   false – *i.e.*, they are "'false or misleading with respect to the underlying subject matter [the

23   statement] address[es].'"  *Montanio v. Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 216-17

24   (D. Vt. 2017) (citing *Virginia Bankshares*, 501 U.S. at 1091-96).

25         *Hot Topic* illustrates this point.  In *Hot Topic*, plaintiff alleged that the defendants, the Hot

26   Topic, Inc. board, misleadingly stated in a merger proxy that a set of projections developed during

27   ――――――――――――――
     [6]     Defendants actually cite to *Omnicare* for the contrary proposition, but that is inaccurate in
28   this context.  ECF No. 69 at 20.

1   the merger process (the "Hot Topic Revised Projections") "reflected a more accurate view of Hot

2   Topic's growth prospects."  *Hot Topic*, 2014 WL 7499375, at *5.  Plaintiff alleged that the Hot

3   Topic board actually believed that a different and higher set of projections, the "'LRP [Long Range

4   Plan] Projections represented [Hot Topic]'s more likely long-term prospects.'"  *Id*.

5         The Hot Topic defendants, similar to Defendants here, argued on a motion to dismiss that

6   plaintiff had not identified any factual statements actionable under §14(a).  *Id*. at *5.  The court

7   disagreed.  *Id*. at *8.  The court held that just because the statements at issue "involved Defendants'

8   opinions or belief," it did not mean that the plaintiffs were barred from recovery.  *Id*. at *5.  The

9   court emphasized that "'[k]nowingly false statements of reasons, opinion, or belief, even though

10  conclusory in form, may be actionable under §14(a) as misstatements of material fact.'"  *Id*. (quoting

11  *Virginia Bankshares*, 501 U.S. at 1083).  The court held that the defendants' opinions regarding Hot

12  Topic's projections were actionable false statements if plaintiff adequately alleged: (1) subjective

13  falsity – *i.e.*, that defendants "believed the LRP Projections accurately represented the Hot Topic's

14  long term prospects" and (2) objective falsity – *i.e.*, that "the LRP Projections actually more

15  accurately represented Hot Topic's prospects than the [Hot Topic] Revised Projections."  *Id*.

16        *Precision Castparts* is also instructive.  On claims under §14(a), plaintiff alleged that

17  defendants' statements that a lower set of financial projections, which failed to incorporate the

18  company's own acquisition strategy, "'reflected management's most up-to-date and accurate

19  forecasts'" at the time of the merger.  *NECA-IBEW Pension Trust Fund v. Precision Castparts*, 2017

20  WL 4453561, at *8 (D. Ore. Oct. 3, 2017) *report and recommendation adopted*, 2018 WL 533912

21  (D. Ore. Jan. 24, 2018).  To demonstrate falsity, plaintiff identified "many examples of how,

22  contrary to the proxy statement, [the company's] acquisition strategy was a continuing part of its

23  business plan," including prior statements from defendants about the viability and importance of the

24  acquisition plan and subsequent facts following the issuance of the proxy that showed the company

25  did, in fact, continue with acquisitions.  *Id*. at *7.  Based on these allegations, the court found that

26  plaintiff adequately pled both that the statements at issue were "objectively falsity" and "subjectively

27  false."  *Id.* at *8.

28

1    Here, Plaintiff's allegations concerning the timing of the Board's sudden and unsupported

2  reversal of its positions regarding the Company's financial projections supports the subjective falsity

3  of the Gigamon Defendants' statement that the Updated Case C Projections best reflected the

4  operative reality of the Company, and the opinion that the consideration offered to shareholders was

5  financially fair, which itself was predicated upon the Board's representation concerning the

6  Company's Updated Case C Projections.

7    Before the Merger was even contemplated, Gigamon had a long-term growth plan and

8  projections in place that reliably estimated a 20%-25% growth plan for the end of 2017 and near

9  future.  ¶¶2(b), 9, 85, 97, 117.  This plan, reflected in the Case B Projections, is what CEO Hooper

10  and CFO Jackson repeatedly shared with investors and what analysts used in assessing the Company

11  and its prospects throughout 2017.   ¶¶4, 9, 11, 81, 85, 97, 106, 116-117, 124.   The Case B

12  Projections were also the only plans shared with potential merger partners, including Elliott.  ¶9.  In

13  fact, the Case B Projections were used throughout the entire merger negotiation process, including

14  *after* Gigamon missed earnings in the second quarter and *after* the Defendants – but not investors –

15  knew Gigamon would also miss earnings in the third quarter.  ¶¶9, 104, 108, 114, 117-118.  These

16  projections valued Gigamon stock at between $42 and $56 per share in a DCF analysis.  ¶¶4, 9, 108.

17    On October 5, 2017, after Gigamon completed its third quarter of 2017, Elliott submitted a

18  revised offer that reduced its bid to just $38 per share, which represented a significant reduction from

19  Elliott's initial offer range of $44 to $46 per share.  ¶113.  To justify this reduction and secure a

20  more valuable transaction for its investors, Elliott represented that the change in its bid was due to

21  the Company missing its guidance for its third quarter operating results.  *Id*.  On October 14, 2017,

22  the Board met to discuss Elliott's bid and the Company's financial projections.  ¶117.  During the

23  meeting, Jackson provided the Board with "an updated draft set of Case B financial projections, that

24  were derived by refreshing the Case B projections to reflect the actual operating results of Gigamon

25  in the second and third quarters of 2017 without otherwise changing the long-term growth

26  assumptions for Gigamon."  *Id*.  With this updated information and ensuing discussion, the Board

27  did not alter its position that the Case B Projections still represented the best estimates of future

28  operating results.  *Id*.

1507934_1

1        On October, 19, 2017, Elliott increased its offer to $38.50 per share, its "absolute best and

2  final offer." ¶119.  With Elliott's bid being the only actionable offer for the Company, the Board

3  was concerned about the consequences of rejecting Elliott's final proposal. ¶120.  Elliott was a

4  notoriously aggressive activist investor, with a history of "belligerent legal strategies and bellicose

5  public language" that has been criticized by targets as "vulture capital," and the Board was

6  concerned that – absent the Merger – Elliott would noisily dump its 15% stake and cause a

7  significant drop in Gigamon's stock price. ¶¶3, 7, 10, 114.  Accordingly, during a meeting on

8  October 24, 2017, the Board "determined that the $38.50 price was acceptable" subject to the

9  negotiation of final terms of the Merger Agreement. ¶¶8, 10, 121.

10        Realizing that the Case B Projections could not support this price, the Board – at the

11  conclusion of the October 24 meeting – directed "Goldman Sachs to use and rely on the Case C

12  Projections in their financial analysis of Gigamon for purposes of the proposed transaction and the

13  rendering of its fairness opinion." ¶¶10, 121.  No new information had emerged since the Board's

14  prior meeting just five days earlier that supported the sudden change in the Board's position

15  regarding the Company's financial projections, but the Updated Case C Projections resulted in

16  significantly reduced valuations for Gigamon that could facially support a sale of the Company at the

17  price that Elliott was willing to pay. ¶¶8-11, 117, 120.  In its final presentation to the Board,

18  Goldman Sachs valued Gigamon at just $21 to $26 per share in a discounted cash flow analysis

19  using the Updated Case C Projections. ¶11.  Thus, the Board's eleventh-hour decision to disregard

20  the Case B Projections can only be attributed to concerns over Elliott – not any purported changes

21  about Gigamon's long-term financial outlook – and the representations in the Proxy Statement that

22  the Updated Case C Projections "reflect a better estimate of Gigamon's long-term prospects" and the

23  Board believed that Elliott's $38.50 per-share offer was "fair" and in the "best interests of Gigamon

24  and its stockholders" are subjectively false.

25        The objective falsity of the Gigamon Defendants' representations regarding the Case C

26  Projections, and thereby the Board's opinion regarding the fairness of the consideration offered in

27  the Merger, is established by what Gigamon admitted about the fourth quarter after the Board

28  approved the sale of the Company to Elliott.  In a press release issued after the Merger closed,

1    Hooper explained that the Company was "off to a strong start in the first quarter [of 2018], building

2    on the record-setting close we had in 2017." ¶¶12, 136.  Rather than discussing a diminished

3    financial outlook, Hooper stated that "Gigamon posted year-over-year growth in bookings, revenue

4    and operating profit," Gigamon "maintained momentum" going into the next fiscal year, and he was

5    "increasingly bullish about our future." *Id.*[7]

6            Thus, to the extent Plaintiff's claims are not analyzed under *Omnicare*, Plaintiff still properly

7    pleads objective and subjective falsity, and the Motions should be denied.[8]

8            **C.    Defendants' Counterfactual Arguments Are Premature and Improper**
                     **on a Motion to Dismiss**

9

10           At the pleading stage, this Court must "accept the plaintiffs' allegations as true and construe

11   them in the light most favorable to plaintiffs."  *City of Dearborn Heights*, 856 F.3d at 612; *Tellabs,*

12   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 324 (2007).  Any arguments that are

13   "essentially a disagreement with the allegations in the Complaint" merely raise "a factual question

14   not one related to the adequacy of the pleading." *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527,

15   542 (E.D. Va. 2017) (denying motion to dismiss §14(a) claims and rejecting defendants factual

16   equivocations about representations in the proxy statement).  "Defendants may argue their factual

17   disagreements later."  *Blount*, 2017 WL 1055966, at \*7.

---

18   [7]       Objective falsity is further bolstered by Defendants' repeated statements throughout 2017
     expressing unqualified confidence in Gigamon (¶¶2(a)-(f), 51-69, 78, 85, 90-96, 99-100, 131),
19   analysts' valuations of Gigamon based on those public statements that pegged Gigamon's intrinsic
     value at the same range as the Case B Projections (¶¶4, 9, 11, 106, 116, 124), the fact that Gigamon
20   was trading as high as \$43.55 per share just two weeks before the deal was announced (¶115),
     Elliott's expression that Gigamon was "significantly undervalued" at \$30.88-\$36.30, just below the
21   \$38.50 deal price (¶¶9, 70, 72-75), the Updated Case C Projections indicate that Elliott overpaid for
     Gigamon by \$12-\$17 per share (¶11), and the \$38.50 deal price fell below two of Goldman Sachs'
22   three valuation analyses performed in assessing the deal's financial fairness (¶139).

23   [8]       Because the Complaint sufficiently alleges subjective and objective falsity, even if the Court
     agrees with Defendants that the Complaint "sounds in fraud," scienter has been sufficiently pleaded.
24   *In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.*, 431 F.3d 36, 48 (1st Cir. 2005)
     ("Accordingly, the subjective aspect of the falsity requirement and the scienter requirement
25   essentially merge; the scienter analysis is subsumed by the analysis of subjective falsity."); *Podany*
     *v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (explaining that, where the
26   originator of opinion is a defendant, "proving the falsity of the statement 'I believe this investment is
     sound' is the same as proving scienter"); *Hufnagle v. Rino Int'l Corp.*, 2013 WL 3976833, at \*6 n.7
27   (C.D. Cal. Aug. 1, 2013) ("Because Plaintiffs have adequately pled scienter, their subjective falsity
     allegations also suffice.").

28

1    When denying the motion to dismiss in *Blount*, the court rejected counterfactual arguments

2    that sought to justify the false and misleading statements made to shareholders.  2017 WL 1055966,

3    at *7.  Seeking to justify the board's opinion about the fairness of the merger relying upon later-

4    prepared projections, defendants argued that the "November and December Projections, but not the

5    September Projections, take into account the Company's actual results from third quarter 2015 and

6    the Company's 2016 budget proposal."  *Id*.  Defendants also "point[ed] to decreases from third

7    quarter 2014 to third quarter 2015 in the Company's sales, operating income, consolidated adjusted

8    EBITDA, and net income."  *Id*.  The court recognized that "[t]hese arguments, however, amount

9    only to a factual dispute with Plaintiff's allegations, which do not affect the legal sufficiency of the

10   pleadings."  *Id*.  "At this stage of the lawsuit, the Court must assume that Plaintiffs' well-pleaded

11   allegations are true."  *Id*.  "These allegations support Plaintiffs' claim that the September Projections

12   – despite Defendants' purported evidence and arguments to the contrary – are more accurate and

13   reliable than the November and December Projections."  *Id*.

14   Here, the Gigamon Defendants similarly make an improper factual argument that Gigamon's

15   "record setting close" to 2017 could also align with the Updated Case C Projections, and therefore

16   supports the Board's opinions on fairness and which set of projections better reflected the operative

17   reality of the Company.   But whether that is true is not something that can be resolved at the

18   pleading stage.  It is exactly the sort of "he said, she said" factual dispute that must be rejected when

19   a complaint sets forth allegations that present plausible inferences, which the Complaint does here by

20   plausibly alleging that a "record setting close" to 2017 supported the Case B Projections and not the

21   Updated Case C Projections which were based on a quarter that set a record in the opposite direction.

22   Even if the Court were to answer Defendants' invitation to peek around the corners of the

23   Complaint, Gigamon's year-over-year growth metrics confirm that neither the Case C nor Updated

24   Case C scenarios support the Company's statement that it had a "record-setting close."   These

25   metrics support only the growth trajectory in the Case B Projections:

26
| Scenario | Actual Q4 2016 y-o-y Growth | Forecasted Q4 2017 y-o-y Growth | Increase y-o-y? |
|---|---|---|---|
27
| Case B | 27% | 32% | YES |
| Case C | 27% | 21% | NO – decrease |
28
| Updated Case C | 27% | 13% | NO – decrease |

1    *Compare* ECF No. 69 at 8-9.  To be clear: the Case C and Updated Case C Projections forecasted a

2    *smaller* year-over-year growth percentage for Q4 2017.  Only the Case B Projections forecasted a

3    *larger* year-over-year growth percentage.  If, as Defendants claim, fourth quarter year-over-year

4    growth is what "record-setting close" means, then the Case B Projections were, as Plaintiff alleges,

5    the most accurate estimate and should not have been jettisoned once the Gigamon Defendants

6    accepted Elliott's $38.50 per share offer just to give the illusion that the merger price was fair from a

7    financial perspective to Gigamon's shareholders.  *See Bell v. Cameron Meadows Land Co*., 669 F.2d

8    1278, 1281-82 (9th Cir. 1982) (reversing summary judgment decision because plaintiff "offered

9    evidence indicating that [the company's president] had expressly directed [the appraiser] to prepare a

10   conservative document" which "raise[d] a genuine issue of material fact whether the reference to the

11   [appraisal] [r]eport in the Tender Offer was materially misleading").

12        In making this argument, it is also worth noting that Defendants pointedly did not say that

13   Gigamon did not meet or exceed the Case B Projections in attaining their "record–setting close" in

14   2017 or the "fast start in 2018" and "strong momentum into 2018" as announced in May 2018.  In

15   fact, they do not disclose the fourth quarter numbers at all, precluding any actual analysis of the

16   claim by Plaintiff or the Court.  If the Case B Projections so poorly reflected Gigamon's prospects

17   based on then-available information about Q4 2017, one would reasonably expect Defendants to

18   provide the Court with the actual results.[9]

19        Considering what Elliott was offering to buy Gigamon for ($38.50/share), if the Updated

20   Case C Projections better reflected Gigamon's prospects, Elliott wildly overpaid for Gigamon by

21   between $12 and $17 per share.  *See* ¶11.  If, however, the Case B Projections accurately reflected

22   Gigamon's prospects, Elliott underpaid Gigamon's shareholders by at least $3.50 per share and as

23   much as $17.50.  *See* ¶¶9, 13.  The latter is the more plausible scenario, particularly in light of when

24   the projections were adopted (*after* the $38.50 per share offer was accepted and needed to be

25   justified), the fact that Elliott did not rely on the Updated Case C Projections in deciding what price

---

26   [9]     Tellingly, Defendants collectively submitted *19 exhibits* totaling *836 pages* in support of
27   their motion, but did not submit any documents – which would be in their sole possession –
     supporting the positions or otherwise justifying their contention that the Updated Case C Projections
28   would have also supposed a "record close."  ECF Nos. 67, 69.

1    to pay for Gigamon, and that Gigamon had a "record-setting" close to 2017 and a "strong start in the

2    first quarter" of 2018.  *See Hot Topic*, 2014 WL 7499375, at *6 (finding that "[o]n the whole,

3    Plaintiff has alleged enough facts to support the conclusion that the Hot Topic Board moderated its

4    financial projections downward to underestimate the financial value of Hot Topic stock" and that "it

5    is at least plausible that Defendants' changes to Hot Topic's financial projections resulted in a less

6    accurate forecast" and that "Plaintiff has adequately pleaded that Defendants' statements about the

7    Revised Projections in the Proxy Statement were wrong, as was the Fairness Opinion, which was

8    based on the Revised Projections").[10]

9            Thus, the Gigamon Defendants' arguments that merely disagree with the "allegations in the

10   Complaint" are improper and premature, and should be rejected.  *Knurr*, 276 F. Supp. 3d at 542.

11           **D.     The PSLRA's Safe Harbor for Forward-Looking Statements Does Not
                      Insulate Defendants' Present Statements About the Suitability of the
12                    Projections They Based Their Recommendation to Shareholders On**

13           The Gigamon Defendants contend that their materially false and misleading statements and

14   omissions are protected by the PSLRA's safe harbor provision regarding forward-looking

15   statements.  *See* ECF No. 69 at 1-2, 11-15.  In doing so, the Gigamon Defendants both misstate the

16   scope of the safe harbor provision and misconstrue the nature of Plaintiff's allegations.  Rather than

17   contesting the accuracy of any set of projections, Plaintiff's allegations concern current statements

18   and opinions at the time of the transaction which the safe harbor does not shield.

19           "The PSLRA's safe harbor is designed to protect companies and their officials from suit

20   when optimistic projections of growth in revenues and earnings are not borne out by events."  *In re*

21   *Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).  As Defendants' own legal

22

23   _____

     [10]     The Gigamon Defendants suggest that disclosing both sets of projections somehow shields
24   them from liability for the materially false and misleading statements in the Proxy Statement.  Not
     so.  *See Precision Castparts*, 2017 WL 4453561, at *9 (rejecting defendants' argument that Proxy
25   Statement was not misleading because both sets of forecasts were disclosed because argument
     "entirely discounts the persuasiveness of the fairness opinion issued by Credit Suisse, which at the
26   defendants' direction relied only on a version of the May Forecasts that assumed a non-acquisition
     strategy"); *Hot Topic*, 2014 WL 7499375, at *8 (finding that the "inclusion of both projections in the
27   Proxy Statement in reasonable detail does not excuse the allegedly false information regarding the
     relative accuracy of the two projections" because the "information was allegedly designed to mislead
28   shareholders into weighing the Revised Projections more heavily than the LRP Projections, which
     could cause them to undervalue their stock").

1   authority explains, the safe harbor provision only protects against claims based on "fraud by

2   hindsight" when forward-looking financial projections are subsequently missed.  *See, e.g.*, *In re*

3   *Cutera Sec. Litig.*, 610 F.3d 1103, 1106-07 (9th Cir. 2010) (finding that the safe harbor provision

4   applied to Rule 10b-5 claims based on "the eventual shortfall in actual revenue" as compared to

5   earlier financial projections); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051,

6   1506 (9th Cir. 2014) (finding that the safe harbor provision applied to Rule 10b-5 claims based on

7   the company "falling slightly short of its expected 49-50% growth" it had previously projected for

8   the fiscal year).

9       Conversely, the Ninth Circuit recently explained that "the safe harbor is not designed to

10  protect companies and their officials when they knowingly make a materially false or misleading

11  statement about current or past facts." *Quality Sys.*, 865 F.3d at 1142.[11]  "Nor is the safe harbor

12  designed to protect them when they make a materially false or misleading statement about current or

13  past facts, and combine that statement with a forward-looking statement." *Id.*; *Mulligan v. Impax*

14  *Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) (explaining that "numerous cases from around

15  the country . . . have held that statements of past or present *facts* are not covered by the safe harbor

16  provision – even when the inextricably tied with forward-looking statements") (emphasis in

17  original).

18      Consistent with these principles, recent decisions make clear that false and misleading

19  statements related to a company's financial projections are not protected by safe harbor when they

20  concern present or historical information or opinions, and the claims are not based on mere fraud by

21  hindsight.  For example, in *Precision Castparts*, 2017 WL 4453561, at *12, plaintiff alleged that

22  defendants made false and misleading statements concerning the justification for "excluding

23  acquisitions" from the company's financial projections, which resulted in reduced cash flows and

24  lower valuations, and the representation that such projections "reflected management's most up-to-

25

---

26  [11]     Counsel's failure to even cite *Quality Systems* is particularly glaring considering that counsel recently failed to inoculate mixed statements in a motion to dismiss in another securities case against

27  Gigamon in this District.  *See Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1051 (N.D. Cal. 2018) (citing *Quality Systems* and holding that "the non-forward-looking portions of Burns'

28  statement are not protected by the Safe Harbor Provisions of the PSLRA").

1   date and accurate forecasts" at the time of the merger.  *Id.* at \*10-\*12.  In denying the motion to

2   dismiss, the court found the safe harbor did not apply because "these statements relate to conditions

3   at the time the Board was formulating an opinion on the merger" and therefore "are not forward-

4   looking." *Id.*

5       Similarly, in *Cowan*, 2018 WL 3243975, the court denied the motion to dismiss when

6   plaintiff alleged that the board's purported confidence in the opinion of its financial advisor

7   concerning the fairness of the merger, as set forth in the proxy, "conflicts with undisclosed facts held

8   by the board concerning the accuracy or potential flaws in the financial advisor's analysis." *Id.* at

9   \*1.  Although the faults in the financial advisor's analysis stemmed from the company's financial

10  projections reflecting understated growth prospects, the court found that the board's opinion at the

11  time of the merger "is not a forward-looking statement under the [PSLRA] and is not subject to the

12  safe harbor provision." *Id.* at \*11.

13      Here, Plaintiff's claims are not based on the Company missing its revenue or earnings

14  forecasts in any particular set of financial projections set forth in the Proxy Statement.  Nor could

15  such allegations even be possible because Gigamon was taken private well before the expiration of

16  the temporal time period the projections, which extended through 2026.  Rather, the Complaint

17  alleges that the Gigamon Defendants made materially misleading statements and omitted material

18  information concerning, ***as of the time of the transaction***, their opinion on the fairness of the

19  consideration offered in the transaction and their contemporaneous beliefs as to the Company's Case

20  B Projections.  ¶¶10-11, 13-14, 114, 117-118, 120-121, 129, 131, 132, 137-138.  The present nature

21  of those statements is demonstrated by the fact that, just like in *Quality Systems*, Plaintiff's

22  allegations here do not concern what occurred after the statements at issue were made, but rather by

23  ascertainable facts ***at the time of the statement*** – *i.e.*, information in Defendants' possession when

24  Defendants made these statements.

25      Defendants' own briefing confirms that the Board's opinions and assessment of Gigamon's

26  financial projections are based on current information and not forward looking conjecture.  As

27  defendants concede, the Board determined to adopt the Updated Case C Projections not because of

28  any assessment of potential future results but because of "'the lower than anticipated third quarter

1    results,'" ECF No. 69 at 6, and because "'the Company was currently performing at levels even

2    below the Case C Projections,'" ECF No. 69 at 8.  In fact, Defendants decided to adopt the Updated

3    Case C Projections because those were the only projections that supported the economic fairness of

4    the Merger – also a contemporary fact.  Thus, its opinions on the fairness of the Merger and which

5    financial case was more appropriate were necessarily based on the Board's (improper) reliance on

6    contemporaneous information, and not forward looking statements.  In this same vein, Plaintiff

7    alleges materially misleading statements of opinions based on the omission of contemporaneously

8    available information – fourth quarter results – and not forward looking statements.  The Gigamon

9    Defendants' Motion thus makes it clear that there is no safe harbor for the Board's opinions on

10   fairness and which set of projections was more appropriate.[12]

11   ## V.    THE COMPLAINT ALLEGES A §20(a) CLAIM

12        To plead control person liability, plaintiff must allege (1) a primary violation of federal

13   securities law by a controlled person; and (2) control of the primary violator by the defendant.  15

14   U.S.C. §78t(a).

15   ### A.    The Gigamon Defendants Concede Control

16        In a footnote, Defendants assert the §20(a) claim should be dismissed solely because

17   "Plaintiff fails to allege the necessary underlying primary violation of the federal securities laws."

18   ECF No. 69 at 24 n.11.  Thus, if the Court determines that plaintiff has sufficiently alleged a §14(a)

19   claim, the §20(a) claim survives as well.  *See Hot Topic*, 2014 WL 7499375, at *11 ("Because the

20   Court found that Plaintiff adequately pleaded a § 14(a) claim against the Individual Defendants, it

21   finds that Plaintiff also successfully pleaded a § 20(a) claim against the Individual Defendants.").

22   ---

23   [12]      Because the present statements about the value of the merger consideration and the Gigamon
     Defendants' recommendation that shareholders vote for the merger were not forward-looking, the
     existence and substance of any warnings is irrelevant.  *See Precision Castparts*, 2017 WL 4453561,
24   at *12 (finding that "no cautionary language – short of an outright admission of the false or
     misleading nature of the non-forward-looking statement – would be 'sufficiently meaningful' to
25   qualify [a materially false or misleading present] statement for the safe harbor"); *see also id.* (finding
     that "there were no statements sufficiently warning or admitting that the present statements at issue
26   were or might be untrue"); *Cowan*, 2018 WL 3243975, at *12 (rejecting defendants' reliance on safe
     harbor warnings, finding that the "[d]isclaimers cautioning shareholders the projections numbers
27   may differ materially from actual results and should not be relied upon as being predictive of actual
     results are not equivalent to cautioning shareholders of the board's expressed reliance on Union
28   Square's fairness opinion").

1

**B.     The Elliott Defendants' Attempt to Challenge Control Fails**

2       Pursuant to §20(a), "a defendant may be liable for securities violations if (1) there is a

3 violation of the Act and (2) the defendant *directly or indirectly* controls any person liable for the

4 violation." *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).  In addition, as the Ninth Circuit has

5 repeatedly held, "'[w]hether [the defendant] is a controlling person is an *intensely factual question*,

6 involving scrutiny of the defendant's . . . power to control corporate actions.'" *Id.* (quoting *Kaplan*

7 *v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).  Importantly, it is clear in the Ninth Circuit that "'[i]n

8 order to make out a prima facie [§20(a)] case, *it is not necessary to show actual participation or the*

9 *exercise of power*.'"  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.*

10 *Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

11       The Complaint here sufficiently alleges control of Gigamon and its board and directors by

12 the Elliott Defendants by reason of the Elliott Defendants' contractual obligations with Gigamon and

13 the Elliott Defendants' 15.3% collective ownership of Gigamon.  Specifically, Article V of the

14 Merger Agreement required the Gigamon Defendants to refrain from changing the operation of the

15 Company's business or engaging in a variety of activities without the express written consent of the

16 Elliott Defendants.  ¶160.  Gigamon was also not permitted to file the Proxy Statement without

17 providing it to the Elliott Defendants and their counsel to review and comment on the document.  *Id.*;

18 *see also* ¶38.  Gigamon was also required to give the Elliott Defendants access to the Company,

19 including all assets, properties, books and records, and personnel.  ¶160.  A key term in the Merger

20 Agreement and condition to closing of the Merger required Gigamon to have $230 million cash on

21 hand, which requirement clearly controlled how Gigamon did business while the Merger was

22 pending.  ¶135 n.13.  "Pleading opportunities to provide information, to review the proxy, and to

23 comment on the substance of the proxy, Pension Fund alleges sufficient facts to support the

24 inference HIG, LBT Acquisition, and LBT Merger Sub at least had the potential to influence

25 Lionbridge's board in approving and recommending the merger to its shareholders."  *Cowan*, 2018

26 WL 3243975, at *14 (finding allegations that acquirer was "obligated to cooperate in preparing and

27 filing the proxy statement and to provide Lionbridge certain information" and had "opportunity to

28

1    review and comment on the proxy statement before Lionbridge issued it to its shareholders"

2    sufficient to allege control).

3         Despite these sufficient allegations, the Elliott Defendants contend that boilerplate

4    contractual obligations inherent in every merger transaction simply cannot suffice to state a claim.

5    ECF No. 65 at 8. Yet, "control" is defined by the SEC as "the possession, direct or indirect, of the

6    power to direct or cause the direction of the management and policies of a person, whether through

7    ownership of voting securities, ***by contract, or otherwise***." 17 C.F.R. §230.405; *see also* H.R. Conf.

8    Rep. No. 73-1383, at 26 (1934) ("[W]hen reference is made to 'control,' the term is intended to

9    include actual control as well as what has been called legally enforceable control. . . . A few

10   examples of the methods used are stock ownership, lease, ***contract***, and agency."). As such,

11   contractual obligations are quintessential indicia of control.

12        In *Lane v. Page*, 581 F. Supp. 2d 1094 (D.N.M. 2008), the defendants similarly sought to

13   dismiss a complaint because it did not allege actual control and contractual relationships were

14   insufficient to establish liability. The court rejected defendants' motion to dismiss because "[b]ased

15   upon the underlying securities violations [plaintiff] has sufficiently pled, and the showing of

16   potential control through contractual relationships, [plaintiff] has made a sufficient showing for his §

17   20(a) claim to survive a motion to dismiss." *Id.* at 1132; *see also Cowan*, 2018 WL 3243975, at *14

18   (finding contractual obligations sufficient to allege §20(a) claim).

19        The Elliott Defendants' motion to dismiss the §20(a) claim should be denied.

20   **VI.    CONCLUSION**

21        "Unlike poker where a player must conceal his unexposed cards, the object of a proxy

22   statement is to put all one's cards on the table face-up. In this case only some of the cards were

23   exposed; the others were concealed." *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990). The

24   Complaint here pleads materially misleading opinion statements and omissions that, "under all the

25   circumstances" present in this case "would have assumed actual significance in the deliberations of

26   the reasonable shareholder." *TSC*, 426 U.S. at 449.

27

28

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS - 3:17-cv-06653-WHO                              - 24 -

1    Defendants' Motions should be denied.

2    DATED: November 30, 2018                    Respectfully submitted,

3                                                ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
4                                                DAVID T. WISSBROECKER
                                                 DANIELLE S. MYERS
5                                                MAXWELL R. HUFFMAN

6

7                                                    s/ David T. Wissbroecker
                                                  DAVID T. WISSBROECKER
8
                                                 655 West Broadway, Suite 1900
9                                                San Diego, CA  92101-8498
                                                 Telephone:  619/231-1058
10                                               619/231-7423 (fax)

11                                               ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
12                                               SHAWN A. WILLIAMS
                                                 Post Montgomery Center
13                                               One Montgomery Street, Suite 1800
                                                 San Francisco, CA  94104
14                                               Telephone:  415/288-4545
                                                 415/288-4534 (fax)
15
                                                 Lead Counsel for Plaintiff
16
                                                 JOHNSON FISTEL LLP
17                                               W. SCOTT HOLLEMAN
                                                 99 Madison Avenue, 5th Floor
18                                               New York, NY 10016
                                                 Telephone: 212/802-1486
19                                               212/602-1592 (fax)

20                                               Additional Counsel for Plaintiff

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on November 30, 2018, I authorized the

3

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

5

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

6

the non-CM/ECF participants indicated on the attached Manual Notice List.

7

                                s/ David T. Wissbroecker

                               DAVID T. WISSBROECKER

8

9

                               ROBBINS GELLER RUDMAN

                                 & DOWD LLP

10

                               655 West Broadway, Suite 1900

                               San Diego, CA  92101-8498

11

                               Telephone:  619/231-1058

                               619/231-7423 (fax)

12

                               E-mail:  dwissbroecker@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1507934_1

# Mailing Information for a Case 3:17-cv-06653-WHO Carpenter v. Gigamon Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David J. Berger**
  dberger@wsgr.com,dakivalles@wsgr.com

- **Jerome F. Birn , Jr**
  jbirn@wsgr.com

- **Colin B. Davis**
  cdavis@gibsondunn.com,bakin@gibsondunn.com

- **Nadeem Faruqi**
  nfaruqi@faruqilaw.com

- **Elizabeth Rose Gavin**
  bgavin@wsgr.com,ncuen@wsgr.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,smarton@faruqilaw.com,jnassir@faruqilaw.com,ecf@faruqilaw.com,bgiacalone@faruqilaw.com

- **Maxwell R Huffman**
  mhuffman@rgrdlaw.com

- **Michael James Kahn**
  MJKahn@gibsondunn.com,MSnider@gibsondunn.com

- **Robert W. Killorin**
  rwk@bellsouth.net

- **Eun Jin Lee**
  elee@rgrdlaw.com,3542483420@filings.docketbird.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Joni L. Ostler**
  jostler@wsgr.com,eblackey@wsgr.com

- **Michael Van Gorder**
  mvangorder@faruqilaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com,1101510420@filings.docketbird.com

- **James M. Wilson , Jr**
  jwilson@faruqilaw.com

- **David Todd Wissbroecker**
  dwissbroecker@rgrdlaw.com,jaimem@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**W.                            Scott Holleman**
Johnson Fistel LLP
99 Madison Avenue 5th Floor
New York, NY 10016