UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. GOLUB, | Case No. 17-cv-06653-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| GIGAMON INC., et al., | Re: Dkt. No. 69 |
| Defendants. | |

Plaintiff John E. Golub, a former shareholder of Gigamon Inc. ("Gigamon"), brings suit individually and on behalf of a putative class of shareholders against the company, Gigamon Chief Executive Officer Paul A. Hooper, Gigamon's directors (collectively, these related parties are the "Gigamon Defendants"), and the Elliott Defendants arising from the allegedly materially false and misleading proxy statement issued in relation to Elliott's acquisition of Gigamon (the "Acquisition").[1] Consolidated Complaint ("Compl.") at ¶¶ 1, 18 [Dkt No. 56]. Golub alleges that the proxy statement misled shareholders into voting to approve the Acquisition at an unfair price per share, violating § 14(a) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9. *Id.* at ¶ 6. The defendants move to dismiss because the allegedly false and misleading

---

[1] The Gigamon directors include Corey M. Mulloy, Arthur W. Coviello, Jr., Joan Dempsey, Ted C. Ho, John H. Kispert, Paul E. Milbury, Michael C. Ruettgers, Robert E. Switz, and Dario Zamarian. The "Elliott Defendants" refers collectively to Elliott Management Corporation, Elliott Associates, L.P., Elliott International, L.P., Evergreen Coast Capital, Ginsberg Holdco, Inc., and Ginsberg Merger Sub, Inc. Elliott Management Corporation is an investment firm that, through its affiliated entities, invests in private and public companies; Elliott Associates L.P. and Elliott International L.P. are investment funds advised by Elliott Management; Evergreen Coast Capital is Elliott Management's private equity arm; and Ginsberg Holdco, Inc., and Ginsberg Merger Sub, Inc. are corporations formed by Elliott Associates for the sole purpose of effectuating the Acquisition. Compl. at ¶¶ 32-37.

portions of the proxy statement are subject to a statutory safe harbor and are not objectively false. I agree and grant defendants' motion to dismiss with leave to amend.

BACKGROUND[2]

## I. GIGAMON'S OUTLOOK PRIOR TO ACQUISITION DISCUSSIONS

Gigamon provides traffic visibility solutions that enable companies to see data traversing networks, enabling stronger security and enhancing network performance. *Id.* at ¶¶ 2, 49. Gigamon's business model was successful at converting initial customers into repeat customers. *Id.* at ¶ 51. Throughout 2017, it had more than two times the market share of revenue than its next closest competitor. *Id.* at ¶ 2. Prior to the Acquisition, Gigamon announced that it was partnering with the three largest cloud-based providers and that this would dramatically expand its potential customer base. *Id.* at ¶ 53.

In early 2017, Gigamon pre-released its preliminary Q4 2016 results, showing only 27% growth.[3] *Id.* at ¶ 57. Despite underperforming analyst expectations, 2016 was still Gigamon's second consecutive year of 40% growth. *Id.* at ¶ 56. At a February 2, 2017 conference call, Hooper stated that the company expected Q2 2017 to create a glide path to the back half of the year that would still allow Gigamon to achieve a growth rate in the 20%-25% range. *Id.* at ¶ 59-61. On April 27, 2017, Gigamon announced that the company recorded $2.2 million loss for Q1 2017. *Id.* at ¶ 64. It attributed the swing from the previous year's net income of $2.9 million to an uptick in spending on research and development, sales, and marketing. *Id.* Despite this drop, Hooper continued to express confidence in the fundamentals of the business and that interest in upcoming products would allow Gigamon to meet its end of the year growth targets. *Id.* at ¶¶ 65-69.

## II. ELLIOTT AND POTENTIAL BUYERS BEGIN TO COURT GIGAMON

On March 14, 2017, an entity referred to in the Proxy Statement as "Party A" expressed interest in acquiring Gigamon. *Id.* at ¶ 71. Hooper informed Party A that Gigamon was not for sale and asked Party A to refrain from submitting an acquisition proposal until he was able to

---

[2] I accept Golub's allegations in the Consolidated Complaint as true for purposes of this motion.
[3] All percentages are year-over-year revenue growth.

discuss the matter with Gigamon's Board of Directors. *Id.* On April 25, 2017, the Board and Gigamon's financial advisor, Goldman Sachs, met to discuss Party A's offer and determined to take no action. *Id.*

On March 9, 2017, roughly a week before Party A approached Gigamon, Elliott began purchasing Gigamon stock for between $30.88 and $36.30 per share. *Id.* at ¶ 70. At this point, Elliott's acquisition of Gigamon stock was not yet public. *Id.* On May 8, 2017, a few weeks after Gigamon's Board decided to take no action as to Party A, an Elliott representative contacted Hooper to inform him that Elliott would be disclosing that it had accumulated an equity stake in Gigamon and that it would seek to discuss strategic options, including a potential sale of Gigamon via a going-private transaction in which Elliott might participate as a buyer. *Id.* at ¶ 72. Although the Elliott representative stated that Elliott would not make any public statements beyond information in its Schedule 13D disclosure, Gigamon regarded Elliott as an aggressive activist investor and feared a public fight. *Id.* Later that day, Elliott filed its Schedule 13D disclosing that it had acquired a 15.3% stake in Gigamon and that it believed the stock was "significantly undervalued and represent[ed] an attractive investment opportunity.[4] *Id.* at ¶ 73. On that day, Gigamon's common stock closed at $41.20, up from the previous day's closing price of $35. A few days later, an entity referred to in the Proxy Statement as Party B also expressed interest in acquiring Gigamon. *Id.* at ¶ 76.

On May 12, 2017, Gigamon's Board and Goldman Sachs met to discuss Elliott's outreach. *Id.* at ¶ 77. The next day, Gigamon met with Elliott representatives who stated that, in their view, Gigamon was ill-suited to be a public company, that the Board should initiate a sales process, and that Elliott was interested in being the buyer. *Id.* at ¶ 79. On May 14, 2017, the Board met again and decided to defer a formal sales process until Gigamon released its Q2 2017 results. *Id.* at ¶ 80.

---

[4] Elliott Defendants dispute this amount, stating that Elliott Associates and Elliott International disclosed in a Schedule 13D filed with the Securities and Exchange Commission that they had collectively acquired 7.2% of Gigamon's shares. The 13D also disclosed that Elliott Associates (including through a nonparty subsidiary) and Elliott International had entered into derivative agreements that collectively gave them economic exposure, but not ownership or voting rights, to 8.1% of Gigamon's shares. Elliott Defendants' Motion to Dismiss Consolidated Complaint ("Elliott MTD") at 3 [Dkt. No. 65].

The Board met again on May 22, 2017, and Chief Financial Officer Rex S. Jackson stated that work was underway to prepare management's long-term financial projections. *Id.* at ¶ 81. At some point in the following weeks Elliott again reached out to reiterate its interest in buying Gigamon. *Id.* at ¶ 82. During this same time period, Hooper spoke with a representative of Party A to update it on issues raised by Elliott's 13D filling. *Id.* Elliott reiterated its interest throughout June. *Id.* at ¶ 87.

On May 30, 2017, Jackson presented three scenarios of management's long-term financial projections: a base-case stand-alone business plan ("Case B"), an upside case ("Case A"), and a downside case ("Case C"). *Id.* at ¶ 83. A few days later, on June 2, 2017, Reuters reported that Gigamon was preparing to hold talks with potential acquirers. *Id.* at ¶ 84. After two trading days, on June 5, 2017, Gigamon's stock price rose 9%, closing at $42.85 per share. *Id.* On June 6, 2017, the Board met again to discuss management's projections and instructed Goldman Sachs to focus on Case B when conducting its financial analysis of Gigamon. *Id.* at ¶ 86.

III. **SECOND QUARTER FINANCIAL RESULTS AND THE START OF ACQUISITION DISCUSSIONS**

On July 2, 2017, the Board met to discuss Gigamon's preliminary Q2 2017 results and decided to initiate sale of the company. *Id.* at ¶ 88. Later that day, Hooper contacted an Elliott representative to invite Elliott to participate in an exploratory sale process. *Id.* at ¶ 89. Goldman Sachs, at the Board's behest, also began to contact various potential buyers. *Id.* Gigamon eventually entered into confidentiality agreements with certain parties and management met with a handful of potential buyers. *Id.* The Board also established a Transaction Committee. *Id.* In public statements on July 27, 2018 and August 8, 2017, Hooper and Jackson stated that Gigamon was continuing to have success with its new products and expressed optimism that the company would hit its year end growth. *Id.* at ¶¶ 91-95, 99.

On July 31, 2017, Gigamon received indications of interest from Elliott, Party A, and Party B to acquire Gigamon for a price range of $44 to 46 per share, $42 to $43 per share, and $40 to $41 per share respectively. *Id.* at ¶ 98. Based on Party B's low bid, the Board instructed Goldman Sachs to terminate discussions with Party B. *Id.* The Board also instructed Goldman Sachs to

inform Elliott and Party A that their offers were inadequate and needed to be increased. *Id.*
Throughout August, Elliott met with members with Gigamon's management and conducted
extensive due diligence. *Id.* Party A met once with Hooper and conducted less due diligence. *Id.*

On August 31, 2017, the Board met again to discuss the status of the sale process and
observed that only Elliott was actively exploring a purchase of Gigamon. *Id.* at ¶ 101. Since there
were not likely to be multiple potential buyers, the Board noted that Goldman Sachs's fairness
opinion on any eventual deal price would rely on having financial projections that yielded a range
of values encompassing the eventual deal price. *Id.*

On September 7, 2017, an Elliott representative contacted director Kispert, who was not a
member of the Transaction Committee, to "better understand the Board's expectations on value."
Kispert told Elliott to "stretch on price." *Id.* at ¶ 102. The next day, Elliott offered to buy
Gigamon for $42 per share. *Id.* at ¶ 103. Party A did not submit a revised bid. *Id.* On September
10, 2017, the Transaction Committee met with Goldman Sachs to discuss the sale process, the
status of the company's business, and the preliminary financial analysis, focusing on Case B. *Id.*
at ¶ 104. The Board concluded that if Gigamon achieved its Q3 2017 and full year 2017 targets, it
should be valued higher than Elliott's latest offer price. *Id.* The Board instructed Goldman Sachs
to reject Elliott's offer without providing a counteroffer. *Id.* Goldman Sachs conveyed the
Board's rejection to Elliott that same day. *Id.* The Board also decided not to contact any other
third parties to seek a strategic transaction. *Id.*

## IV.    NEGOTIATIONS WITH ELLIOTT AND Q3 2017 RESULTS

Three weeks later, on September 21, 2017, the Board met with management and Goldman
Sachs regarding the status of discussions with Elliott and the company's business. *Id.* at ¶ 107.
Hooper continued to express optimism regarding the company's Q3 2017 results but also noted
signs of softening. *Id.* Goldman Sachs indicated that Elliott was unlikely to improve its offer
without greater visibility into the Q3 2017 results. *Id.* The Board agreed it would be prepared to
accept Elliott's latest offer price of $42.50 per share but instructed Goldman Sachs to seek a
higher price. *Id.* Goldman Sachs informed Elliott of the Board's decision, but Elliott stated that
its debt financing commitments had expired and that its lenders would want to see Gigamon's Q3

1   2017 results before renewing their commitments.  *Id.*

2         On September 24, 2017, the Board concluded that $42.50 per share was likely a premium

3   to where Gigamon's stock would trade if it announced lower-than-expected Q3 2017 results and

4   did not simultaneously announce a sale (after much speculation that a sale was imminent) and

5   determined that $42.50 would be acceptable.  *Id.* at ¶ 108.  This price fell at the lower end of the

6   Case B Projections, which estimated Gigamon's value at between $42 and $56 per share.  *Id.*

7   Over the next several days, Goldman Sachs informed Elliott that the Board had determined that

8   the $42.50 per share offer price was acceptable pending an agreement on other transaction terms

9   and management met with Elliott representatives and Goldman Sachs to discuss expected Q3 2017

10  results.  *Id.* at ¶¶ 109-110.

11        Shortly after, the Q3 2017 results became available internally.  They were significantly

12  lower than anticipated.  *Id.* at ¶ 111.  Revenue fell $5.5 million below Wall Street analysts'

13  consensus.  *Id.*  With the Transaction Committee's approval, Goldman Sachs met with Elliott to

14  discuss the Q3 2017 results.  *Id.*  On October 4, 2017, the Transaction Committee met to discuss

15  the status of discussions with Elliott.  *Id.* at ¶ 112.  Goldman Sachs relayed that Elliott

16  representatives were very surprised by the magnitude of Gigamon's third quarter revenue miss and

17  were purportedly having difficulty securing debt commitments on similar terms as before.  *Id.*

18  Management also reported that Reuters was planning to run another article stating that Elliott was

19  terminating acquisition discussions because the Board's price expectation was too high.  *Id.*  The

20  Transaction Committee discussed the potential need to revisit Gigamon's long-term financial

21  projections.  *Id.*

22        The next day, on October 5, 2017, Elliott reduced its bid to $38 per share based solely on

23  the Q3 2017 financial results, not over concerns over its long-term value.  *Id.* at ¶ 113.  Later that

24  day, the Board, management, and Goldman Sachs met to discuss Elliott's revised offer.  *Id.* at ¶

25  114.  They "recognized that earlier valuation ranges for the Company, which had been based on

26  the Case B projections, were materially higher than Elliott's then current offer price" and "could

27  no longer be relied upon."  *Id.*

28        On October 14, 2017, the Board met to discuss the status of discussions with Elliott and

Gigamon's purported outlook. *Id.* at ¶ 117. Jackson provided an updated draft set of Case B Projections that included the actual results of Q2 and Q3 2017 but did not otherwise change the long-term growth assumptions for Gigamon. *Id.* The refreshed Case B Projections were not disclosed in the Proxy Statement or any proxy supplements. *Id.* The Board discussed abandoning the company's long-term financial projections but declined to do so while in negotiations with Elliott, recognizing that would be "impracticable and inadvisable." *Id.* at ¶ 118. The Board agreed that Elliott's $38 per share offer would still need to be improved to fall within the range indicated by the refreshed Case B Projections to be acceptable. *Id.*

On October 19, 2017, Elliott increased its offer to $38.50 per share, which it called its "absolute best and final offer[.]" *Id.* at ¶ 119. On October 20, 2017, the Transaction Committee met with management and Goldman Sachs to discuss Elliott's offer. *Id.* at ¶ 120. The Transaction Committee decided that "the Case B Projections were no longer appropriate given recent performance and third quarter results." *Id.* On October 24, 2017, the Board met to discuss the status of the transaction, determined that the offer of $38.50 was acceptable, and "authorized management to instruct representatives of Goldman Sachs to use and rely on the Case C Projections in their financial analysis of Gigamon for purposes of the proposed transaction and rendering its fairness opinion." *Id.* at ¶ 121.

On October 26, 2017, Goldman Sachs presented financial analyses to the Board based on the Updated Case C Projections; it stated that Elliott's $38.50 per share offer was fair. *Id.* at ¶ 123. After Goldman Sachs completed its presentation, the Board formally approved Gigamon's entry into the Merger Agreement. *Id.* Later that day, Gigamon announced its agreement to be acquired by Elliott for $38.50 per share. *Id.*

## V.     THE PROXY STATEMENT AND GOLUB'S CLAIMS

On November 23, 2017, Gigamon filed the Proxy Statement recommending that Gigamon's shareholders vote "FOR" the adoption of the Merger Agreement and sent two notices urging shareholders to vote on December 4 and 11, 2017. *Id.* at ¶¶ 126, 128; Proxy Statement [Dkt. No. 69-2]. On December 12, 2017, Gigamon issued a Proxy Supplement updating the background to the Merger and Fairness Opinion sections of the proxy. Compl. at ¶ 126. On

December 22, 2017, a majority of Gigamon shares were cast in favor of the Acquisition. Compl. at ¶ 126. The Acquisition closed on or about December 27, 2017. *Id.*

Golub alleges that the Proxy Statement omitted and/or misrepresented material information about Gigamon's intrinsic value that made it more likely shareholders would be misled into voting in favor of the Acquisition. *Id.* at ¶¶ 128-129. Golub contends that because the deal was described as fair based upon the Updated Case C Projections prepared by management and Goldman Sachs's fairness opinion exclusively relied on the Updated Case C Projections, shareholders were misled about the long term value of the company. *Id.* at ¶¶ 128-129. Instead, Golub argues, the Gigamon Defendants should have disclosed the refreshed or Updated Case B Projections or used the refreshed or Updated Case B Projections as the basis for the fairness opinion. *Id.* Only with this disclosure would shareholders be able to make an informed decision whether $38.50 per share was actually "fair." *Id.*

Golub also alleges that portions of the Proxy Statement that discuss how and why the Board chose to rely on the Updated Case C projections rather than the Case B Projections were false in order to hide an attempt by the Board to find a way to ensure that Elliott's offer price of $38.50 per share could be declared fair. *Id.* at ¶¶ 130-131. He claims that the Board knew that the Updated Case B Projections accurately reflected Gigamon's long-term prospects because: Gigamon had consistently met or exceeded management's projections; management had consistently touted the company's success and reliable growth and publicly expressed zero doubts; other analysts relying on Gigamon's public statements valued Gigamon between $42-$50 per share; the Board only directed Goldman Sachs to use the Updated Case C Projections two days before entering into the Merger Agreement to give the illusion that the Acquisition was "fair"; and, when the Proxy Statement and Proxy Supplement were disseminated to shareholders, Gigamon Defendants were aware that the company was on-track to have a record close to 2017.[5]

---

[5] Golub notes that in a May 3, 2018 press release, Gigamon stated that it had a "record-setting" close in 2017 and that it had maintained its momentum with its customer base. *Id.* at ¶ 136. As the Proxy Statement was put forth on November 24, 2017, and Gigamon was already two-thirds of the way through its fourth quarter, Golub contends that Gigamon would know that it was still on track to have a "record-setting close" for 2017. *Id.* at ¶ 137.

*Id.* at ¶ 131.  Golub believes that the Proxy Statement should have disclosed Updated Case A,

Updated Case B, and refreshed Case B Projections, along with a description of how Gigamon's

new products were treated in preparing the Updated Case C Projection.  *Id.* at ¶ 132.

Golub brings two claims.  His first claim is against the Gigamon Defendants for violations

of § 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 for preparing,

reviewing, and/or disseminating the false and misleading Proxy Statement.  *Id.* at ¶¶ 149-156.  His

second claim is for control person liability under § 20(a) of the Securities and Exchange Act of

1934 against Hooper, the Director Defendants, and the Elliott Defendants.  *Id.* at ¶¶ 157-160.

**REQUEST FOR JUDICIAL NOTICE**

In connection with their motion to dismiss, the Gigamon Defendants seek judicial notice of

seventeen documents, including the Proxy Statement, Gigamon's press releases, U.S. Securities

and Exchange Commission ("SEC") filings, and transcripts of earnings calls.  Gigamon

Defendants' Request for Judicial Notice and Incorporation by Reference in Support of Motion to

Dismiss Consolidated Complaint.  [Dkt. No. 70].  The Elliott Defendants also request judicial

notice of the May 8, 2017 Schedule 13D that certain of the Elliott Defendants filed with the SEC.

Elliott Defendants' Request for Judicial Notice in Support of Motion to Dismiss Plaintiff's

Consolidated Complaint.  [Dkt. No. 68].

Judicial notice is proper.  Documents alleged in a complaint and essential to a plaintiff's

allegations may be judicially noticed pursuant to Federal Rule of Evidence 201.  *Steckman v. Hart*

*Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).  "Although generally the scope of review on a

motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider

evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2)

the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the

copy attached to the 12(b)(6) motion."  *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th

Cir. 2010) (internal quotation marks and citation omitted).  The court may "treat such a document

as part of the complaint, and thus may assume that its contents are true for purposes of a motion to

dismiss under Rule 12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  A court may

also take judicial notice of documents on which allegations in the complaint necessarily rely, even

if not expressly referenced in the complaint, provided that the authenticity of those documents are not in dispute. *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 837-38 (N.D. Cal. 2000).

Golub opposes taking judicial notice of every exhibit besides the Proxy Statement and the Elliott's Schedule 13D. Lead Plaintiff's Opposition to Defendants' Requests for Judicial Notice [Dkt. No. 74]. He does not object to the court taking judicial notice of specified facts within Gigamon's Exhibits 3-11, 15, and 17. *Id.* He objects to judicial notice of several of the conference call transcripts, arguing that he is unsure if the attached transcripts are the same version used to prepare the complaint. This argument fails because he does not raise doubts about the authenticity or accuracy of the transcripts. *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 CIV. 2347 (NRB), 2018 WL 3559089, at *10 n.14 (S.D.N.Y. July 23, 2018) (taking judicial notice of a different version of a call transcript where the authenticity or accuracy of the transcript is not questioned). He also objects to judicial notice of two press releases referenced to in the complaint, arguing that the quotations were not substantial enough to warrant incorporation by reference. I disagree. Golub cites to multiple paragraphs of the January 17, 2017 press release. This is sufficient to allow incorporation by reference. Although the April 27, 2017 press release is only quoted in two sentences, it is appropriate for incorporation by reference. Accordingly, I grant both defendants' requests for judicial notice in their entirety.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). This is the same standard under Federal Rule of Civil Procedure 9(b). With respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted).

"To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). (quotation marks and citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun'

genre, or even the 'most plausible of competing inferences. *Id.* at 324. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

## I. THE CLAIMS AGAINST THE GIGAMON DEFENDANTS

### A. The Section 14(a) Claims

Golub brings claims against the Gigamon Defendants under Section 14(a) and SEC Rule 14a–9 for preparing, reviewing, and/or disseminating the allegedly false and misleading Proxy Statement. *Id.* at ¶¶ 149-156. He states that the Proxy Statement and Proxy Supplement were misleading and contained untrue statements of material facts and material omissions.

Section 14(a) of the 1934 Act and SEC Rule 14a–9 "disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000); see also 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9(a). "To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)), overruled on other grounds by *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc).

The Private Securities Litigation Reform Act (PSLRA) requires a plaintiff stating a claim under Section 14(a) to: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is made," 15 U.S.C. § 78u–4(b)(1)(B); (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u–4(b)(2)(A); and (3) establish that "the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages," *id.* § 78u–4(b)(4), that is, plead "loss causation," *Stoneridge Inv. Partners v. Sci.–Atlanta*, 552 U.S. 148, 165 (2008).

### 1.    Forward Looking Statement Under the PSLRA Safe Harbor

The Gigamon Defendants argue that Golub's Section 14(a) claims must be dismissed because the challenged portions of the Proxy Statement are forward looking statements protected by the PSLRA's "safe harbor" provision. Gigamon Defendants' Motion to Dismiss Consolidated Complaint at 11-13 (the "Gigamon MTD") [Dkt. No. 69]. Specifically, the Gigamon Defendants contend that the safe harbor provision covers the portions of the Proxy Statement that discuss the Board's decision to use the Updated Case C Projections rather than the Case B Projections or Updated/Refreshed Case B Projections because of the Board's belief that the Updated Case C Projections were a better reflection of Gigamon's financial outlook. *Id.*

Under the PSLRA's safe harbor provision, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement." See 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-looking statement is defined as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5(i)). When a statement includes both forward-looking and non-forward-looking statements, the challenged statements still fall within the safe harbor as forward-looking if, when "examined as a

whole, the challenged statements relate[ ] to future expectations and performance." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

In opposition, Golub argues that the Board's statements are not forward-looking and, instead, constitute statements and opinions current to the time of the transaction and not shielded by the PSLRA safe harbor. Lead Plaintiff's Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss at 19-22 [Dkt. No. 73]. He states that the safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events. *Id.* at 19-20 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)). The safe harbor, Golub contends, is not meant to shield companies and their officials when they knowingly make a materially false or misleading statements about current or past facts or combine such facts with a forward looking statement. *Id.*

In support of his argument, Golub cites three cases. Each is distinguishable. In *Quality Sys.,* the Ninth Circuit found that the defendants misrepresented the defendant company's current and past sales pipeline and unlawfully relied on the misrepresentations to support optimistic projections. 865 F.3d at 1140-50. The court reasoned that this misrepresentation was the basis for the company's forward-looking statements, that the statements constituted mixed statements (i.e. containing non-forward-looking statements about current and past facts as well as forward-looking statements about projected growth in revenue and earnings), and that they lacked sufficient cautionary language to fall under the PSLRA safe harbor provision. *Id.* at 1146-50. The company in *Quality Sys.* specialized in electronic health records software and much of its early growth was driven by healthcare providers adopting electronic healthcare systems for the first time. *Id.* at 1135-36. Plaintiffs alleged that in numerous public statements, the company continued to represent that there was still a large market of health care providers who had not yet switched to electronic record keeping. *Id.* at 1138-39. But the company knew that these sorts of customers were beginning to dry up and it was already switching its business model to one based on replacing a new customer's electronic record keeping system run by a competitor with one run by the company. *Id.* This allegation of misrepresentation was supported by numerous confidential

14

witnesses and the verified complaint of a former board member who had resigned from the board. *Id.* In his resignation letter, the former board member described what he characterized as securities laws violations. *Id.* Here, there is no allegation that the Updated Case C Projections were based on misrepresentations of a similar nature. Instead, it appears that Gigamon's Board chose to use the Updated Case C Projections based on Gigamon's disappointing Q2 2017 and Q3 2017 results after it had previously believed that Q1 2017 and Q2 2017 would be a "glide path" to a profitable next two quarters. Compl. at ¶ 130 (d) ("it was determined that Gigamon's recent performance clearly suggested that the Case B Projections over-stated Gigamon's long-term prospects [and that] that the Case C Projections appeared to reflect a better estimate of Gigamon's long-term prospects (particularly, in view of the fact that the Company was currently performing at levels even below the Case C Projections)").

Golub's second case, *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 3:16-cv-01756, 2017 WL 4453561, at *7 (D. Or. Oct. 3, 2017), report and recommendation adopted, No. 3:16-cv-01756, 2018 WL 533912 (D. Or. Jan. 24, 2018), is similarly distinguishable. There, the defendant company's business model relied on constant acquisitions activity and a continuation of this strategy was reflected in its initial financial projections. *Id.* at *2-3. Yet, after it began discussions to be acquired by a large financial buyer, the company instructed its financial advisor to rely on a new forecast that involved no acquisitions over the next five years. *Id.* at *3. The plaintiffs claimed the fairness opinion based on the non-acquisition model forecast in the proxy statement was false because there "there was no actual plan for the Company to suddenly abandon its acquisition strategy in July 2015," and "the Company's growth through acquisitions was not expected to slow down in the foreseeable future." *Id.* at *6. Indeed, the company made two more acquisitions after filing its proxy statement and acknowledged that it "intended to continue pursuing acquisition opportunities." *Id.* at *7. Based on these allegations, the court found that the proxy statement was objectively false and misleading because the non-acquisition forecast was not accurate and up-to-date. *Id.* The court also found that since the statement could be construed as a warning, the company did not presently intend to continue its acquisition strategy, it must be properly construed as a present assessment of the company's intentions at the

time of the proposed merger. *Id.* at *11. Here, the changes in the Updated Case C Projections were not based on a change in business model but rather the disappointing results of Q2 2017 and Q3 2017. In other words, the change in forecast is based on a past event informing future outlook, and is not a statement that Gigamon intended to change its business model.

Golub's third case, *Laborers' Local #231 Pension Fund v. Cowan*, No. 17-cv-478, 2018 WL 3243975, at *9 (D. Del. July 2, 2018), is similar to *Precision Castparts.* Despite publicly pursuing an acquisition growth strategy, the defendant company in *Cowan* did not incorporate its potential growth through acquisitions in the financial projections it provided to its financial advisor. *Id.* at *1. This failure to incorporate potential growth through acquisitions was the basis for the financial advisor's fairness opinion in the proxy statement. *Id.* To make the misrepresentation more glaring, three days after closing, the defendant company announced another acquisition. *Id.* Here, Gigamon's Board did not direct Goldman Sachs to rely on projections that involved a fundamentally different business model than the one actually executed by the company.

Golub's argument that the challenged statements are not forward looking because they are based on "contemporaneous beliefs that the Updated Case C projections reflected a better estimate of Gigamon's long-term prospects than the Case B Projections" is not persuasive either. Oppo. at 21 (internal quotation marks omitted). As the court in *City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) explains:

> To take the view that an expression of "present belief" in a forward-looking statement is a "present fact"—and therefore not itself a forward-looking statement—would work an end-run around the PSLRA's safe harbor provision. Expressing confidence or lack thereof in a given projection is not different from making a projection. Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it.

(citing *Grobler v. Neovasc Inc.*, 2016 WL 6897760, at *5 (D. Mass. Nov. 22, 2016)). It strains logic to suggest that it is possible to make a forward looking statement that is not in at least some way based on a belief about the present state of things. *Wochos v. Tesla, Inc.*, No. 17-cv-05828-CRB, 2018 WL 4076437, at *5 (N.D. Cal. Aug. 27, 2018) ("[E]very future projection depends on the current state of affairs. Were the Court to adopt Plaintiffs' conclusion, the distinction between

16

present statements and forward-looking statements would collapse.").  The Updated Case C

Projections are classic forward-looking statements because they pertain to revenues and other

financial data, the accuracy of which cannot be determined until after the projection period

(assuming the Acquisition had not been consummated and Gigamon were still an independent

entity).  *Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 991–92 (S.D. Ind.

2018) (citing see 15 U.S.C. § 78u–5(i)(1)(A)).

That Gigamon would later announce that it had a "record-setting" close in 2017 and that it

had maintained its momentum with its customer base does not, without more, create an inference

that the Gigamon Defendants knew that relying on the Updated Case C Projections constituted a

misrepresentation of the value of the company.  Compl. at ¶¶ 136-37.  It does not necessarily

follow that Gigamon's weak Q2 and Q3 2017, followed by a presumably successful Q4 2017,

boded well for the company's long term prospects.  To infer that would constitute a claim of

"fraud by hindsight," precisely what the PSLRA safe harbor is designed to guard against.  *FEI*,

289 F. Supp. 3d at 1171-72 ("fraud by hindsight suits are not meaningfully different from [claims

under Section 14(a) because] [i]n both cases, a company makes a purportedly inaccurate forward-

looking statement that induces plaintiffs to act to their detriment") (internal quotation marks

omitted).  Golub has not alleged that there is a misrepresentation baked into the Updated Case C

Projections that would render the Gigamon Defendant's Proxy a present statement outside the

PSLRA's safe harbor requirement.

Golub also argues that his claim is not based on the falsity of any statement by the

Gigamon Defendants.  Oppo. at 8-12.  Rather, Golub brings his claim under *Omnicare, Inc. v.*

*Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) on the grounds that

the Board omitted material facts in their possession underlying the basis for its opinions and

rendering its opinion statements misleading to a reasonable person.  *Id.*  The Ninth Circuit has

only extended *Omnicare* to Section 10(b) and Rule 10b-5 claims, not to Section 14 claims.  *City of*

*Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir.

2017).  Golub cites only one case, *Laborers' Local #231 Pension Fund v. Cowan*, No. CV 17-478,

2018 WL 3243975, at *9 (D. Del. July 2, 2018) applying *Omnicare* to a Section 14 claim, and I

am only able to find one other. *See Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, No. CV CCB-17-132, 2018 WL 1535496, at *6 (D. Md. Mar. 28, 2018). Because neither case is from this circuit or district, I decline to extend *Omnicare* past the Ninth Circuit's guidance in *Dearborn Heights*.

### 2. Cautionary Statements under the PSLRA

The Gigamon Defendants also contend that the Proxy Statement identified the projections as "forward-looking" and included "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." Gigamon MTD at 13-14 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). Specifically, they point to two sections. The first section, entitled "Forward-Looking Statements," contains generalized explanations of what a forward-looking statement is. *Id.*; Proxy Statement at 19-20. The second section is a paragraph under the "Management Projections" subheading in the section entitled "The Merger." Gigamon MTD at 13-14; Proxy Statement at 58-59. It states:

> Although a summary of the Management Projections is presented with numerical specificity, they reflect numerous assumptions and estimates as to future events made by Gigamon management that they believed were reasonable at the time the Management Projections were prepared, taking into account the relevant information available to Gigamon management at the time. However, this information is not fact and should not be relied upon as being necessarily indicative of actual future results. Important factors that may affect actual results and cause the Management Projections not to be achieved include general economic conditions, Gigamon's ability to achieve forecasted sales, accuracy of certain accounting assumptions, changes in actual or projected cash flows, competitive pressures and changes in tax laws. In addition, the Management Projections do not take into account any circumstances or events occurring after the date that they were prepared and do not give effect to the Merger. As a result, there can be no assurance that the Management Projections will be realized, and actual results may be materially better or worse than those contained in the Management Projections. The Management Projections cover multiple years, and such information by its nature becomes less reliable with each successive year. The inclusion of the Management Projections in this proxy statement should not be regarded as an indication that the Board of Directors, Gigamon, Goldman Sachs or any of their respective affiliates or representatives or any other recipient of this information considered, or now considers, the Management Projections to be predictive of actual future results. The summary of the Management Projections is not included in this proxy statement in order to induce any stockholder to vote in favor of the proposal to adopt the Merger Agreement or any of the other proposals to be voted on at the Special Meeting. We do not intend to update or otherwise revise the Management Projections

> to reflect circumstances existing after the date when made or to reflect
> the occurrence of future events, even in the event that any or all of the
> assumptions underlying the Management Projections are shown to be
> in error or no longer appropriate. **In light of the foregoing factors
> and the uncertainties inherent in the Management Projections,
> stockholders are cautioned not to place undue, if any, reliance on
> the projections included in this proxy statement.**

*Id.* (emphasis in original). The Gigamon Defendants correctly point out that other courts have

found less complete cautionary statements to be sufficient. Gigamon MTD at 14 (citing *Intuitive*

*Surgical*, 759 F.3d at 1059-60 (finding sufficient cautionary language in a disclaimer that "[a]ctual

results may differ materially from those expressed or implied, as a result of certain risks and

uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings.

Prospective investors are cautioned not to place undue reliance on such forward-looking

statements."); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("[T]hese prepared

remarks contain forward-looking statements concerning future financial performance and

guidance . . . management may make additional forward-looking statements in response to

questions, and . . . factors like Cutera's ability to continue increasing sales performance worldwide

could cause variance in the results."). Tellingly, Golub does not dispute the sufficiency of the

cautionary statements contained in the Proxy Statement.

As the challenged statements are forward-looking and are accompanied by sufficient

cautionary statements, they are protected by the PSLRA's safe harbor; no liability may arise from

them based on the allegations in the complaint. *FEI*, 289 F. Supp. 3d at 1174 (finding that the safe

harbor provision applies to forward-looking statements related to a challenged financial projection

in a proxy statement). On these grounds alone, Golub's claims fail.

### 3. The Objective and Subjective Falsity of the Updated Case C Projections

The Gigamon Defendants also argue that if the challenged statements were not covered by

the PSLRA's safe harbor provision, Golub failed to allege that the Proxy Statement contained

facts that are objectively or subjectively false under the pleading standards imposed by the

PSLRA. Gigamon MTD at 15-20. Their core argument is that: (1) Golub has failed to plead facts

showing that the Updated Case C Projections were incorrect when they were disclosed and that the

Gigamon Defendants believed the projections were false; and (2) the Gigamon Defendants believed that the Case B Projections were in fact the correct forecast of Gigamon's outlook. *Id.*

As the Supreme Court articulated in *Va. Bankshares, Inc. v. Sandberg*, to state a claim under Section 14(a) for a misstatement of material fact, a plaintiff must also allege both that the statements were objectively false and that the defendants subjectively believed the statements were false. 501 U.S. 1083, 1096; see also *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (holding that allegedly misleading opinions give rise to a claim under § 11 of the Securities Act of 1933 "only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading") (citation omitted); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005) ("To state a claim upon which relief can be granted, plaintiff must allege particularized facts showing that the opinion was both subjectively and objectively false.") (citation omitted). The statements must have been false at the time they were made. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000) (citing 17 C.F.R. § 240.14a–9).

Golub contends that objective falsity is established by the May 3, 2018 press release where Hooper stated that Gigamon was "off to a strong start in the first quarter [of 2018], building on the record-setting close we had in 2017." Oppo. at 15-16; Compl. at ¶¶12, 136. Rather than discussing a diminished financial outlook, Golub notes, Hooper stated that "Gigamon posted year-over-year growth in bookings, revenue and operating profit," the company "maintained momentum" going into the next fiscal year, and he was "increasingly bullish about [Gigamon's] future." *Id.*

In response, the Gigamon Defendants point out that the Updated Case C Projections as described in the Proxy Statement did not fail to incorporate the assumption of a "record-setting close" for 2017 and that even under the Updated Case C Projection, Gigamon was expected to have a record-setting close. Gigamon MTD at 16-17. The Updated Case C Projections estimated revenues of $314 million, a new record for yearly revenues (in 2016 and 2015 Gigamon brought in $311 million and $222 million, respectively). *Id.*; Proxy Statement at 58. Additionally, the Updated Case C Projections also assumed record-setting revenues for Q4 2017of $96.105M,

which was $11 million higher than Gigamon's prior best quarter. *Id*.[6] Given that the Updated Case C Projections still predicted a record setting fiscal year and fourth quarter, the Updated Case C Projections cannot be said to be objectively false in light of the May 3, 2018 press release.

Golub argues that I should ignore the Gigamon Defendants' argument because, at the motion to dismiss stage, all facts should be construed in a light most favorable to Golub as the non-moving party. Oppo. at 16-19. But when reviewing dismissal for failure to state a claim, I need not "accept as true allegations that contradict matters properly subject to judicial notice[.]" *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

The optimistic statements by the Gigamon defendants between January 10 and August 8, 2017 neither support Golub's claim of objective falsity with regards to the Updated Case C Projections nor show that the Gigamon Defendants secretly believed that the Case B Projections were correct. Compl. at ¶¶ 50-69, 74-75, 78, 85, 90-97, 99-100, 106. These statements were made before what Gigamon acknowledged was a surprisingly poor Q3 2017. The Proxy Statement explains that management adjusted its projections in response. Compl. at ¶ 111; Proxy Statement at 42. It is of no help to Golub that the board changed its projections after its optimism that Q2 2017 would create a glide path to market growth rate in the second half of the year was shown to be unwarranted after a disappointing Q3 2017. *See Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 991 (S.D. Ind. 2018) (rejecting argument that forecasts in proxy were false because they were "not commensurate with" defendants' prior, more hopeful and optimistic statements).

Golub has failed to show objective falsity with particularized facts that "directly contradict" or are "necessarily inconsistent with" the Updated Case C Projections. *In re Read-Rite*

---

[6] Gigamon Defendants come to this number by taking Gigamon's announced results for Q1 through Q3 2017, which would have been incorporated into the Updated Case C Projections to determine that Gigamon had total revenues of $218 million, which, subtracted from the Updated Case C Projections' 2017 revenue estimate of $314 million as stated in the proxy, means that the Projections assume Q4 2017 revenues of 96.105 million. Gigamon MTD at 16 citing Compl. at ¶¶ 64, 91, 111; Gigamon First Quarter 2017 Financial Results Press release [Dkt. No. 69-14]; Gigamon Q1 2017 Earnings Call Transcripts [Dkt. No. 69-15]; Gigamon Q2 2017 Earnings Call Transcripts [Dkt. No. 69-17]. Gigamon's largest ever quarter to date at that time was Q4 2016, with revenues of $85M. Gigamon Fourth Quarter 2016 Financial Results Press release [Dkt. No. 69-3].

*Corp.*, 335 F.3d 843, 848 (9th Cir. 2003), abrogated on other grounds as recognized in *S. Ferry, L.P. No. 2 v. Killinger*, 542 F.3d 776, 782-84 (9th Cir. 2008). Given that failure, I need not consider his arguments related to subjective falsity at this time.[7]

### 4. Failure to Disclose Other Additional Projections

To the extent that Golub's arguments are based on the Gigamon Defendants' failure to disclose the original Case C Projections, the Updated Case A and Case B Projections, the long-term projections that predated the Case A, B, and C Projections, or the timing, methodology, or rationale employed for making the downward revisions, he is incorrect. Compl. at ¶¶ 81, 129, 131-132. The original Case C Projections are on page 57 of the Proxy Statement. There is nothing to suggest that an Updated Case A or Case B Projections were ever created. The Board did refresh the Case B Projections to reflect Q2 and Q3 2017 without otherwise changing the long-term growth assumptions and determined that it likely overstated the company's long-term growth prospects. Proxy Statement at 42. It is hard to see how refreshed Case B Projections could be material as they were not relied upon by the Board. The older long-term projections had been regularly communicated to investors and analysts in quarterly earning calls and their materiality to Golub's claims are dubious. Compl. at ¶¶ 57-69, 81, 85, 91, 99. Finally, the Proxy Statement describes in detail when and why the Board updated the Case C Projections. Proxy Statement at 41-44, 58.

### B. The Section 20(a) Claims

To state a Section 20(a) claim, a plaintiff must allege both "a primary violation of the federal securities law" and "that the defendant exercised actual power or control over the primary violator." *Dearborn Heights*, 856 F.3d at 623 (quoting *Zucco Partners*, 552 F.3d at 990) (internal quotation marks omitted). Because Golub has failed to state a claim for a primary violation under Section 14(a), there can be no control person liability under Section 20(a) against Hooper and the Director Defendants. *Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed

---

[7] Golub relies heavily on *In re Hot Topic, Inc. Sec. Litig.*, No. 13-cv-02939, 2014 WL 7499375 (C.D. Cal. May 2, 2014) in his opposition. *See e.g.* Oppo. at 12-19. Because *Hot Topic* is primarily about subjective falsity and Golub cannot show objective falsity, it is of limited probative value here.

summarily . . . if a plaintiff fails to adequately plead a primary violation").

## II.     THE SECTION 20(a) CLAIMS AGAINST THE ELLIOTT DEFENDANTS

The Elliott Defendants argue that Golub cannot state a Section 20(a) claim against them. Elliott MTD. In the Ninth Circuit, to exercise control over the primary violator, a Section 20(a) defendant must control "management and policies" of the company or "direct its day-to-day affairs[.]" *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996).

As an initial matter, since there is no primary violation, there can be no control person claim under Section 20(a) against the Elliott Defendants. But even if a primary violation had been found, Golub has failed to plead control person liability against the Elliott Defendants under the PSLRA's pleading requirements. *In re Atmel Corp. Derivative Litig.*, No. 06-cv-4592-JF/HRL, 2008 WL 2561957, at *11 (N.D. Cal. June 25, 2008) (applying the PSLRA to Section 20(a) claims).

Golub bases his Section 20(a) claim against the Elliott Defendants on (1) the Elliott Defendants' 15.3% stake in Gigamon; (2) Article V of the Merger Agreement's requirement that Gigamon refrain from changing the operation of its business or engaging in a variety of activities without the express written consent of the Elliott Defendants; (3) §7.1(a)(ii) of the Merger Agreement's requirement that Gigamon provide the Proxy Statement to Elliott Defendants and their counsel for review and comment before publication; and (4) §7.5 of the Merger Agreement's requirement that Gigamon must give the Elliott Defendants access to Gigamon, including all assets, properties, books and records, and personnel (subject to reasonable limits as set forth in the Merger Agreement). Compl. at ¶ 160.

This argument fails for several reasons. First, holding a minority share of a company does not establish control person liability. See *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. 99-cv-00109-SBA, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (20% equity interest insufficient to establish control). Second, the clause in Article V of the Merger Agreement is boilerplate language that is insufficient to give the Elliott Defendants control over Gigamon. Third, by its own terms, the Merger Agreement only required Gigamon to allow the Elliott Defendants to view and comment on the Proxy Statement before publication. The Elliott

Defendants had no power to prevent Gigamon from publishing the Proxy Statement after review, nor to force Gigamon to accept or consider any of the Elliott Defendant's comments. Fourth, the Elliott Defendant's access to Gigamon's assets, properties, books and records, and personnel did not grant it control over those things. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005).

Golub's Section 20(a) claim against the Elliott Defendants therefore fails on two counts. He has failed to state a claim for a primary violation. And his allegations, taken as true, do not show that the Elliott Defendants had control over the "management and policies" of Gigamon or the power to "direct its day-to-day affairs."

## CONCLUSION

Golub's Section 14(a) and Rule 14a–9 claims against the Gigamon Defendants are precluded under the PSLRA safe harbor provision. Further, Golub is unable to show that the challenged portions of the Proxy Statement are objectively false. Because Golub is unable to state a claim for a primary violation under Section 14(a) and Rule 14a-9, his Section 20(a) claim necessarily fails as well, and I grant the Gigamon Defendant's motion to dismiss. As there is no primary violation and no control shown, Golub's Section 20(a) claim against the Elliott Defendants also fails. I grant the Elliott Defendant's motion to dismiss.

Golub may file an amended complaint within 20 days.

**IT IS SO ORDERED.**

Dated: March 12, 2019

William H. Orrick
United States District Judge