UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. GOLUB,<br><br>   Plaintiff,<br><br>  v.<br><br>GIGAMON INC., et al.,<br><br>   Defendants. | Case No. 17-cv-06653-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 88 |

Plaintiff John E. Golub brings claims under the § 14(a) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 against Gigamon Inc., Gigamon Chief Executive Officer Paul A. Hooper, and Gigamon's directors (collectively, these related parties are referred to as "Gigamon") arising from an allegedly materially false and misleading proxy statement issued in relation to the acquisition of Gigamon by Elliot (the "Acquisition"). [1] Amended Consolidated Complaint ("AC") [Dkt No. 85]. In a previous order, I dismissed largely identical claims in Golub's Consolidated Complaint ("CC") [Dkt. No. 48] because I found that the allegedly false and misleading portions of the proxy statement were subject to a statutory safe harbor and were not objectively false. Order Granting Motion to Dismiss ("Order") [Dkt. No. 83]. Although Golub has amended his complaint, he fails to plead new facts that would change my reasoning. Accordingly, I GRANT Gigamon's motion to dismiss without leave to amend.

---

[1] The Gigamon directors include Corey M. Mulloy, Arthur W. Coviello, Jr., Joan Dempsey, Ted C. Ho, John H. Kispert, Paul E. Milbury, Michael C. Ruettgers, Robert E. Switz, and Dario Zamarian. AC at ¶¶ 17-25. "Elliott" refers collectively to Elliott Management Corporation, Elliott Associates, L.P., Elliott International, L.P., Evergreen Coast Capital, Ginsberg Holdco, Inc., and Ginsberg Merger Sub, Inc. *Id.* at 1 n.1. In the CC, the Elliot entities were also named as defendants, but the AC only brings claims against the Gigamon Defendants.

# BACKGROUND

**Factual Background**

My previous Order contained a detailed factual background and I will not fully restate it here. Order at 2-9. Gigamon is a provider of traffic visibility solutions into data traversing networks to make it easier for companies to manage, secure, and understand their data-in-motion, which, in turn, enables stronger security and enhances network performance. AC at ¶ 37. On October 26, 2017, it publicly announced that its Board approved the Agreement and Plan of Merger through which Elliott[2] would acquire Gigamon for a price of $38.50 per share in cash. *Id.* at ¶ 84. On November 24, 2017, Gigamon filed the Proxy Statement at issue in this case. *Id.* ¶ 85. It issued notices to shareholders on December 4 and December 11, 2017 that urged them to vote on the Acquisition. *Id.* On December 12, 2017, it issued a "Supplemental Disclosure," that augmented the background to the Merger and Fairness Opinion sections of the Proxy Statement. *Id.*

On December 22, 2017, a majority of Gigamon shares were cast in favor of the Acquisition. *Id.* The Acquisition closed on December 27, 2017. *Id.* Golub asserts that the proxy statement contained materially false and misleading statements related to the Board's financial projections. *Id.* at ¶ 3.

The sale process began in spring of 2017 when Elliot started to position itself to acquire Gigamon. *Id.* at ¶ 73. In May 2017, the board decided to defer a formal sales process until the company released its Q2 2017 results and that it would be "prudent to review the Company's long term business plans and financial projections." *Id.* at ¶ 74. On May 30, 2017, the Board was presented with three sets of long-term projections: the Case A Projections, which represented "higher projected performance," the Case B Projections, which represented the "base level expectation," and the Case C Projections, which represented "lower projected performance." *Id.* at ¶ 75. On June 6, 2017, the board instructed Goldman Sachs & Co. LLC ("Goldman Sachs"),

---

[2] "Elliott" as defined in the amended complaint refers collectively to Elliott Management Corporation, Elliott Associates, L.P., Elliott International, L.P., Evergreen Coast Capital, Ginsberg Holdco, Inc. and Ginsberg Merger Sub, Inc.

Gigamon's financial advisor, to focus on the Case B Projections when conducting its analysis. *Id.* at ¶ 78.

On July 27, 2017, Gigamon reported that its revenue had declined by 8% in Q2 2017. *Id.* at ¶ 67; Gigamon Form 8-K dated July 27, 2017 attached as Ex. 3 [Dkt. No. 89-3] to Declaration of Elizabeth R. Gavin in Support of Gigamon Defendants' Motion to Dismiss Amended Consolidated Complaint for Violations of Securities Exchange Act of 1934 ("Gavin Decl.") [Dkt. No 89]. Elliot made an offer of $44-46 per share four days later. Proxy at 36. Although there were other potential buyers at one point in the process, by September 7, 2017, all others had dropped out, leaving Elliot as the sole potential buyer. Proxy at 37.

On September 8, 2017, Elliot reduced its offer price to $42 per share. AC at ¶ 78. On September 10, 2018, the board discussed the proposal and concluded that if Gigamon achieved its projected Q3 2017 results, Elliot's offer would be inadequate. Proxy at 38. Elliot and Gigamon continued to negotiate through September 19, 2019 and Elliot indicated its willingness to increase its offer to $42.25-$42.50. *Id.* at 38-39. On September 24, 2017, after learning that $42.50 was Elliott's best and final offer, the Board determined that the price was acceptable. *Id.* at 40.

Shortly after, Gigamon's Q3 2017 financial results fell $5.5 million below the analysts' consensus; instead of reporting 3% growth, Gigamon reported 5% decline. *Id.* at 40; AC at ¶ 81. In response, on October 5, 2017, Elliott reduced its offer price to $38 per share. AC at ¶ 79; Proxy at 41.

The Board met that day to discuss the revised offer and also discussed "whether management's long-term financial projections were outdated due to actual second and third quarter performance and trend lines that such results suggested for the full year and beyond." Proxy at 41. According to the Proxy, the board "recognized that earlier valuation ranges for the Company, which had been based on the Case B projections, were materially higher than Elliott's then current offer price and could no longer be relied upon." *Id.* at 41. After a week of unsuccessful attempts to negotiate a higher price, the Board met on October 14, 2017 and were provided with an updated draft set of Case B financial projections that reflected the Q2 2017 and

Q3 2017 results "without otherwise changing the long-term growth assumptions."[3]  AC at ¶ 79, 97(c); Proxy at 41-42.  The Board "expressed concern that Gigamon's recent results . . . might suggest that the long-term growth assumptions reflected in the Case B projections overstate Gigamon's likely long-term financial prospects."  AC ¶ 97(c); Proxy at 42.

On October 19, 2017, Elliott increased its offer price to $38.50 as an "absolute best and final offer."  AC ¶ 80; Proxy at 43.  On October 20, 2017, Gigamon's Transaction Committee agreed that they needed management's best estimate of the long-term outlook to properly assess Elliott's offer and that "Gigamon's recent performance clearly suggested that the Case B Projections were no longer appropriate given recent performance and third quarter results."  Proxy at 43; AC ¶ 97(d).  On October 24, 2017, the Board "agreed that they needed Gigamon's best estimate of [its] long-term financial outlook in order to properly assess a sale of Gigamon."  AC ¶ 97(e); Proxy at 43.  The Board determined that the Case C Projections "appeared to reflect a better estimate of Gigamon's long-term prospects (particularly, in view of the fact that the Company was currently performing at levels even below the Case C Projections)."  AC ¶ 97(e); Proxy at 43.  According to the Proxy, management determined that the Case B Projections were no longer realistic given Q3 2017 performance and updated the original Case C Projections "to take into account actual results of Q2 2017 and Q3 2017 and the revised outlook for Q4 2017."  Proxy at 58; AC ¶ 80.

The Proxy included the Updated Case C Projections, which management stated that it believed reflected "the most likely standalone financial forecast of Gigamon's business."  Proxy at 58.  The Board approved sharing the Updated Case C Projections with Elliott and directed Goldman to rely on it for its fairness opinion.  *Id.*

This action is based on Golub's claim that the Board did not actually believe the Updated Case C Projections contained in the Proxy were accurate.  AC at ¶¶ 88-98.  Instead, Golub alleges that the Board knew that the Updated Case B Projections were accurate and that they should have been included in the proxy instead.  *Id.* at ¶¶ 88-98.  As evidence of this, Golub points to

---

[3] Golub characterizes the following statements in the Proxy as material misrepresentations.  AC at ¶¶ 97-98.

4

Gigamon's more successful Q4 2017 and Q1 2018. *Id.* at ¶¶ 86-87.

**Procedural Background**

In the Order, I dismissed Golub's consolidated complaint on several grounds. First, I found that the challenged portions of the Proxy Statement were forward looking provisions protected by the PSLRA's "safe harbor" provision and that they were accompanied by meaningful cautionary language. Order at 13-19. I reasoned that:

> The Updated Case C Projections are classic forward-looking statements because they pertain to revenues and other financial data, the accuracy of which cannot be determined until after the projection period (assuming the Acquisition had not been consummated and Gigamon were still an independent entity). *Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 991–92 (S.D. Ind. 2018) (citing [ ]15 U.S.C. § 78u–5(i)(1)(A)).
>
> That Gigamon would later announce that it had a "record-setting" close in 2017 and that it had maintained its momentum with its customer base does not, without more, create an inference that the Gigamon Defendants knew that relying on the Updated Case C Projections constituted a misrepresentation of the value of the company. Compl. at ¶¶ 136-37. It does not necessarily follow that Gigamon's weak Q2 and Q3 2017, followed by a presumably successful Q4 2017, boded well for the company's long term prospects. To infer that would constitute a claim of "fraud by hindsight," precisely what the PSLRA safe harbor is designed to guard against. *FEI*, 289 F. Supp. 3d at 1171-72 ("fraud by hindsight suits are not meaningfully different from [claims under Section 14(a) because] [i]n both cases, a company makes a purportedly inaccurate forward-looking statement that induces plaintiffs to act to their detriment") (internal quotation marks omitted). Golub has not alleged that there is a misrepresentation baked into the Updated Case C Projections that would render the Gigamon Defendant's Proxy a present statement outside the PSLRA's safe harbor requirement.

*Id.* at 17.

Second, I found that Golub's reliance on Gigamon's successful Q4 2017 did not help him plead objective falsity as required by a Section 14 claim because:

> The Updated Case C Projections estimated revenues of $314 million, a new record for yearly revenues (in 2016 and 2015 Gigamon brought in $311 million and $222 million, respectively). *Id.*; Proxy Statement at 58. Additionally, the Updated Case C Projections also assumed record-setting revenues for Q4 2017of $96.105M, which was $11 million higher than Gigamon's prior best quarter. *Id.*[4] Given that the

---

[4] "Gigamon Defendants come to this number by taking Gigamon's announced results for Q1 through Q3 2017, which would have been incorporated into the Updated Case C Projections to

5

> Updated Case C Projections still predicted a record setting fiscal year and fourth quarter, the Updated Case C Projections cannot be said to be objectively false in light of the May 3, 2018 press release.

*Id.* at 20-21. I also held that:

> The optimistic statements by the Gigamon defendants between January 10 and August 8, 2017 neither support Golub's claim of objective falsity with regards to the Updated Case C Projections nor show that the Gigamon Defendants secretly believed that the Case B Projections were correct. Compl. at ¶¶ 50-69, 74-75, 78, 85, 90-97, 99-100, 106. These statements were made before what Gigamon acknowledged was a surprisingly poor Q3 2017. The Proxy Statement explains that management adjusted its projections in response. Compl. at ¶ 111; Proxy Statement at 42. It is of no help to Golub that the board changed its projections after its optimism that Q2 2017 would create a glide path to market growth rate in the second half of the year was shown to be unwarranted after a disappointing Q3 2017. *See Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 991 (S.D. Ind. 2018) (rejecting argument that forecasts in proxy were false because they were "not commensurate with" defendants' prior, more hopeful and optimistic statements).

> Golub has failed to show objective falsity with particularized facts that "directly contradict" or are "necessarily inconsistent with" the Updated Case C Projections. *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003), abrogated on other grounds as recognized in *S. Ferry, L.P. No. 2 v. Killinger*, 542 F.3d 776, 782-84 (9th Cir. 2008).

*Id.* at 21-22.

Third, I found that the failure to include the refreshed Case B projections was not a material omission because: (i) they were not relied upon by the Board; (ii) the "older long-term projections had been regularly communicated to investors and analysts in quarterly earning calls" and their materiality was dubious; and (iii) the Proxy Statement described in detail when and why the Board updated the Case C Projections. *Id.* at 22. Finally, because Golub failed to allege a primary violation of securities law, his Section 20(a) claims against Hooper and the other directors failed as well. *Id.* at 22-23.

---

determine that Gigamon had total revenues of $218 million, which, subtracted from the Updated Case C Projections' 2017 revenue estimate of $314 million as stated in the proxy, means that the Projections assume Q4 2017 revenues of 96.105 million. Gigamon MTD at 16 citing Compl. at ¶¶ 64, 91, 111; Gigamon First Quarter 2017 Financial Results Press release [Dkt. No. 69-14]; Gigamon Q1 2017 Earnings Call Transcripts [Dkt. No. 69-15]; Gigamon Q2 2017 Earnings Call Transcripts [Dkt. No. 69-17]. Gigamon's largest ever quarter to date at that time was Q4 2016, with revenues of $85M. Gigamon Fourth Quarter 2016 Financial Results Press release [Dkt. No. 69-3]."

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). This is the same standard under Federal Rule of Civil Procedure 9(b). With respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted).

"To adequately demonstrate that the defendant acted with the required state of mind, a

7

complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). (quotation marks and citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences. *Id.* at 324. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

**DISCUSSION**

**I.    REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**

Gigamon asks that I consider certain documents incorporated by reference in the AC and judicially notice other documents they have submitted in support of their motion to dismiss. Defendants' Request for Judicial Notice and Incorporation by Reference in Support of Motion to Dismiss Amended Consolidated Complaint ("RJN") [Dkt. No. 90]. These documents include Gigamon's Proxy Statement, several forms filed by Gigamon with the U.S. Securities and Exchange Commission ("SEC"), Gigamon's press releases, and transcripts of Gigamon's earnings conference calls. *See* Gavin Decl. In my previous order, I took judicial notice of seventeen of these documents. Order at 9-10. The two new documents are Gigamon's Form 10-K filed with the SEC on February 24, 2017 and Gigamon's Form 10-Q filed with the SEC on November 3, 2017. [Dkt. Nos. 89-18, 89-19].

As before, judicial notice of these documents is proper. Documents alleged in a complaint and essential to a plaintiff's allegations may be judicially noticed pursuant to Federal Rule of

8

Evidence 201. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998). Rule 201 states that "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trials court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citation omitted). The court may "treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). A court may also take judicial notice of documents on which allegations in the complaint necessarily rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents are not in dispute. *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 837-38 (N.D. Cal. 2000).

Golub argues that at this stage, judicial notice of these documents should only be for the purpose of recognizing their contents and not as a means to resolve disputed issues of fact. Lead Plaintiff's Memorandum in Opposition to Defendants' Request for Judicial Notice [Dkt. No. 94]. He cites to concerns voiced by the Ninth Circuit that judicial notice and incorporation by reference are sometimes applied improperly in securities cases to resolve disputes of material fact. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018) ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access.").

Although Golub's pleading is styled as an opposition, he is not actually opposing judicial notice or incorporation by reference of any of the documents here. Rather, he merely restates the rule that notice is only proper when facts are not subject to reasonable dispute. That said, it is also

9

1  true that when reviewing a motion to dismiss for failure to state a claim, I need not "accept as true

2  allegations that contradict matters properly subject to judicial notice;" a party may not avoid

3  dismissal by raising an unreasonable factual dispute. *Sprewell v. Golden State Warriors*, 266 F.3d

4  979, 988 (9th Cir. 2001). Gigamon's request for judicial notice is granted.

## II. MOTION TO DISMISS

Gigamon argues that the amended complaint adds nothing of consequence that would allow Golub to avoid dismissal for the same reasons as discussed in my previous order. MTD at 10-11. It characterizes Golub's pleading as simply reiterating that the Proxy Statement was false or misleading because the Updated Case C Projections relied upon by the Board were "unduly pessimistic" and that it should have disclosed the updated draft Case B Projections. *Id.* According to Gigamon, Golub continues to argue that (i) this is a pure omissions case and that the Board should have disclosed that the company was tracking higher during Q4 2017 than the Updated Case C Projections would predict, and (ii) continues to rely on management's earlier, more optimistic statements before Gigamon's poor Q3 2017 results and Gigamon's May 3, 2018 press release announcing a "record-setting close" to 2017. *Id.* Golub states that the only new facts alleged are optimistic statements made by management in 2016 and a July 2018 press release announcing that Gigamon's market share remained essentially flat in 2017. *Id.*

### A. The Section 14(a) Claims

Golub again brings claims against Gigamon under Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a–9 for preparing, reviewing, and/or disseminating the allegedly false and misleading Proxy Statement. AC at ¶¶ 113-120. Section 14(a) of the 1934 Act and SEC Rule 14a–9 "disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000); *see also* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9(a). "To state a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link

in the accomplishment of the transaction.'" *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)), overruled on other grounds by *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc). Here, only the first prong is challenged by Gigamon.

### 1. The PSLRA Safe Harbor

Gigamon argues that the Amended Complaint is based on the same statements about its long term projections as in the prior complaint and that my previous finding that they are subject to the PSLRA safe harbor still applies. MTD at 11-13. Under the PSLRA's safe harbor provision, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i).

#### a. Forward Looking Statements

A forward-looking statement is defined as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5 (i)). When a statement includes both forward-looking and non-forward-looking statements, the challenged statements still fall within the safe harbor as forward-looking if, when "examined as a whole, the challenged statements relate[ ] to future expectations and performance." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

Gigamon points to Golub's reliance on statements that the Board determined that the Case B Projections likely overstated Gigamon's long-term financial prospects and that the Case C Projections and Updated Case C Projections appeared to reflect a better estimate of Gigamon's long term prospects. *Id.* at 12 (citing AC at ¶¶ 97(b)-(e); CC ¶¶ 130(b)-(d)). It contends that Golub's attempt to recast these statements as present-tense statements should not change my

11

analysis because the core of the Amended Complaint remains the same: Golub is asserting that because Gigamon's Q4 2017 results exceeded the Updated Case C Projections, that demonstrates that these projections were false, the Board did not actually believe they were accurate, and the Board did not actually believe that the merger was fair. *Id.* at 12-13.

Gigamon also points to a new challenged statement by Golub: "[t]he lower-than-expected performance in the Company's second quarter of 2017 and, in particular, the Company's third quarter of 2017 [is] an indicator of the continued challenges of the Company to grow top-line revenue and accurately predict its quarterly results." AC ¶ 96; Proxy at 45. The Proxy states that this was "[a]mong the potential risks identified by the Board of Directors" when considering the "Financial Condition, Results of Operations and Prospects" of Gigamon as an independent company. Proxy at 45. According to Gigamon, this statement cannot form the basis of a Section 14(a) claim because the present-tense portions of it are true; Gigamon did have lower-than-expected Q2 2017 and Q3 2017 results and these results were considered a risk by the Board. MTD at 13. But Golub alleges that Gigamon knew that the company did not actually have these issues because it was having "significant ongoing success in Q4" when it issued the Proxy and Proxy Supplement. AC at ¶ 96.

I considered the substance of these allegations in the Order. Golub's attempt to reframe them as present-tense misstatements fails for the same reasons as before. *See* AC at 1 ("This Complaint challenges only present and historical misstatements and omissions of existing fact concerning the Company's then-current results and the Board's recommendation regarding the then-current value of Gigamon. As such, this Complaint does not allege that any projection or forecast was later proven false by subsequent events that were not known to defendants at the time of the acquisition."); Lead Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint for Violations of the Securities Exchange Act of 1934 ("Oppo.") at 1 [Dkt. No. 93]. Golub's disclaimer does not change my analysis.

As I stated in the Order, "Golub's argument that the challenged statements are not forward looking because they are based on 'contemporaneous beliefs that the Updated Case C Projections reflected a better estimate of Gigamon's long-term prospects than the Case B Projections' is not

12

persuasive" because recasting an expression of present belief in a forward looking statement as a present fact "would work an end-run around the PSLRA's safe harbor provision." Order at 16-17 (citing *City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018)). "Expressing confidence or lack thereof in a given projection is not different from making a projection. Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it." *Id.* (citing *FEI*, 289 F. Supp. 3d at 1173).

I reasoned:

> That Gigamon would later announce that it had a "record-setting" close in 2017 and that it had maintained its momentum with its customer base does not, without more, create an inference that the Gigamon Defendants knew that relying on the Updated Case C Projections constituted a misrepresentation of the value of the company. Compl. at ¶¶ 136-37. It does not necessarily follow that Gigamon's weak Q2 and Q3 2017, followed by a presumably successful Q4 2017, boded well for the company's long term prospects. To infer that would constitute a claim of "fraud by hindsight," precisely what the PSLRA safe harbor is designed to guard against. *FEI*, 289 F. Supp. 3d at 1171-72 ("fraud by hindsight suits are not meaningfully different from [claims under Section 14(a) because] [i]n both cases, a company makes a purportedly inaccurate forward-looking statement that induces plaintiffs to act to their detriment") (internal quotation marks omitted). Golub has not alleged that there is a misrepresentation baked into the Updated Case C Projections that would render the Gigamon Defendant's Proxy a present statement outside the PSLRA's safe harbor requirement.

Order at 17. Golub's theory is still based on the idea that Gigamon's successful Q4 2017 proves the falsity of some present tense statement in the Proxy and remains flawed. Additional allegations about Gigamon's increase in market share or past optimism do not change this. AC at ¶ 87.

Golub bafflingly fails to engage with the analysis contained in the Order. He cites to the identical authority from his previous opposition. *See* Oppo. at 7-8, 17-18 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *Laborers' Local #231 Pension Fund v. Cowan*, No. 17-cv-478, 2018 WL 3243975, at *9 (D. Del. July 2, 2018); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 16-cv-01756, 2017 WL 4453561, at *8 (D. Or. Oct. 3, 2017); *In re Hot Topic, Inc. Sec. Litig.*, No. 13-cv-02939, 2014 WL 7499375 (C.D. Cal. May 2, 2014)). I analyzed these cases in the Order and found them unhelpful to Golub. Order at 14-16,

22 n.7.

Golub also argues again that the PSLRA Safe Harbor should not apply because he alleges omissions of present fact (the Updated/Refreshed Case B Projections and Gigamon's Q4 2017 performance). Oppo. at 19-20. In support of this argument, Golub cites to three new cases, but they do not change the analysis. Oppo. at 19. Both *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111 (S.D. Cal. 2012) and *In re Portal Software, Inc. Sec, Litig.*, No. 03-cv-5138-VRW, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005) stand for the proposition that the safe harbor does not cover omissions, not that an omissions claim renders the safe harbor void. Neither *Mallen* nor *Portal* support Golub's argument that the safe harbor does not cover the statements that the Board determined that the Case B Projections likely overstated Gigamon's long-term financial prospects and that the Case C Projections and Updated Case C Projections appeared to reflect a better estimate of Gigamon's long term prospects. In the third case, *In re CV Therapeutics, Inc.*, No. 03-cv-03709-SI, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004), the statements at issue were "allegedly fraudulent and/or misleading statements of historical fact," which is not the case here.

### b. Cautionary Statements Under the PSLRA

In the amended complaint, Golub alleges that the cautionary language in the Proxy is insufficient because it consists of boilerplate disclaimers that appear in nearly every merger proxy. AC at ¶ 106. In support of this argument, Golub attaches charts with a redline comparison of a particular paragraph in the Proxy and compares it to six other paragraphs allegedly drafted around the same timeframe by the law firm that acted as deal counsel for Gigamon in the Acquisition. *Id.* The paragraph at issue states:

> Although a summary of the Management Projections is presented with numerical specificity, they reflect numerous assumptions and estimates as to future events made by Gigamon management that they believed were reasonable at the time the Management Projections were prepared, taking into account the relevant information available to Gigamon management at the time. However, this information is not fact and should not be relied upon as being necessarily indicative of actual future results. Important factors that may affect actual results and cause the Management Projections not to be achieved include general economic conditions, Gigamon's ability to achieve forecasted sales, accuracy of certain accounting assumptions, changes

14

        in actual or projected cash flows, competitive pressures and changes in tax laws. In addition, the Management Projections do not take into account any circumstances or events occurring after the date that they were prepared and do not give effect to the Merger. As a result, there can be no assurance that the Management Projections will be realized, and actual results may be materially better or worse than those contained in the Management Projections. The Management Projections cover multiple years, and such information by its nature becomes less reliable with each successive year. The inclusion of the Management Projections in this proxy statement should not be regarded as an indication that the Board of Directors, Gigamon, Goldman Sachs or any of their respective affiliates or representatives or any other recipient of this information considered, or now considers, the Management Projections to be predictive of actual future results. The summary of the Management Projections is not included in this proxy statement in order to induce any stockholder to vote in favor of the proposal to adopt the Merger Agreement or any of the other proposals to be voted on at the Special Meeting. We do not intend to update or otherwise revise the Management Projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying the Management Projections are shown to be in error or no longer appropriate. **In light of the foregoing factors and the uncertainties inherent in the Management Projections, stockholders are cautioned not to place undue, if any, reliance on the projections included in this proxy statement.**

Proxy Statement at 58-59 (emphasis in original) attached as Exhibit 1 to Gavin Decl. [Dkt. No. 89-1].

      Gigamon argues that the forward-looking statements in the Proxy were accompanied by meaningful cautionary language for several reasons. MTD at 13-14. First, in the Order I already found that this paragraph was sufficient to trigger the safe harbor. *Id.* (citing Order at 18-19). Second, the adequacy of Gigamon's cautionary language is not diminished because one paragraph has been used by other companies. *Id.* Third, the Proxy contained other warnings and incorporated by reference the risk factors in Gigamon's most recent Forms 10-K and 10-Q, which contained had over 21 pages of warnings specific to Gigamon's business. *Id.* As Gigamon argues, there can be no reasonable dispute that the cautionary language is more than adequate. *Id.*

      Golub counters that Gigamon must demonstrate that its cautionary language was not boilerplate and conveyed substantive information. Oppo. at 20-22. Although Golub vacillates between describing the above language as inadequate because it has been used six times and because it is found in "nearly all other merger proxies," his broader point is that it does not absolve Gigamon from making what it characterizes as specific misleading statements and

15

omissions. *Id.* He then argues that the other cautionary language is about the Acquisition itself, not the financial projections, and that the cautionary language in the prior Form 10-K and 10-Q filings is similarly boilerplate. *Id.* Finally, he contends that "[i]f the nonforward-looking statement is materially false or misleading, it is likely that no cautionary language☐short of an outright admission of the false or misleading nature of the non-forward-looking statement☐would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Id.* (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010).

The only new allegation by Golub is that similar cautionary language was used in six other deals involving different companies. AC at ¶ 106. That this language has been used before does not render it boilerplate; Golub cites to no authority that would suggest otherwise. I considered and rejected his other arguments in the Order. Order at 18-19. There, I noted that "other courts have found less complete cautionary statements to be sufficient and "[t]ellingly, Golub does not dispute the sufficiency of the cautionary statements contained in the Proxy Statement." Order at 18-19. (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059-60 (9th Cir. 2014); *Cutera*, 610 F.3d at 1112.

The amended complaint fails to allege any facts that demand a different result from the Order. "As the challenged statements are forward-looking and are accompanied by sufficient cautionary statements, they are protected by the PSLRA's safe harbor; no liability may arise from them based on the allegations in the complaint." Order at 19 (citing *FEI*, 289 F. Supp. 3d at 1174).

### 2. The Omission Claim

To the extent that Golub attempts to bring a pure omission claim under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), I have already held that the Ninth Circuit has not extended *Omnicare* to Section 14 claims. I wrote:

> The Ninth Circuit has only extended *Omnicare* to Section 10(b) and Rule 10b-5 claims, not to Section 14 claims. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). Golub cites only one case, *Laborers' Local #231 Pension Fund v. Cowan*, No. CV 17-478, 2018 WL 3243975, at

16

*9 (D. Del. July 2, 2018) applying *Omnicare* to a Section 14 claim, and I am only able to find one other. *See Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, No. CV CCB-17-132, 2018 WL 1535496, at *6 (D. Md. Mar. 28, 2018). Because neither case is from this circuit or district, I decline to extend *Omnicare* past the Ninth Circuit's guidance in *Dearborn Heights*.

Order at 17-18.

Golub also rehashes his argument that the Proxy should have disclosed the Updated Case B Projections. Oppo. at 15-16. But as I held in the Order, "[i]t is hard to see how refreshed Case B Projections could be material as they were not relied upon by the Board" and "the Proxy Statement describes in detail when and why the Board updated the Case C Projections." Order at 22 (citing Proxy Statement at 41-44, 58). This is distinguishable from the cases cited by Golub. In *Brown v. Brewer*, No. 06-cv-3731, 2010 WL 2472182, at *21 (C.D. Cal. June 17, 2010), the defendant did not disclose "any of the projected growth rates" relied upon by the board. In *Azar v. Blount Int'l, Inc.*, No. 16-cv-483I, 2017 WL 1055966, at *2-3 (D. Or. Mar. 20, 2017), the board relied on a set of earlier undisclosed projections that were more optimistic but changed them, despite gains across several key metrics in a previous quarter. But here the Board did not rely on the refreshed Case B Projections and Gigamon performed surprisingly poorly in the quarters leading up to the use of the Updated Case C Projections.[5]

Golub also argues that the Proxy and Proxy Supplement omitted that Gigamon was concluding a very successful Q4 2017. Oppo. at 16-17. According to Golub, Gigamon should have disclosed their existing knowledge that Q4 2017 was tracking to achieve $102 to $106.25 million in revenue and would lead to a record-setting close that would provide wrong momentum into 2018. *Id.* He claims that this information was material to shareholders because it would have shown that: (a) Gigamon's underperformance in Q3 2017 was temporary and did not signal the end of the company's runway for growth; (b) the company's growth-drivers remained intact; (c)

---

[5] Golub also filed a statement of recent decision, attaching *In re Envision Healthcare Corp.*, No. 18-cv-1068, 2019 WL 3494407 (D. Del. Aug. 1, 2019). [Dkt. No. 100]. Its relevance is unclear; at the time of this order it is an unadopted report and recommendation. Further, although the plaintiffs in *Envision* also brought a Section 14(a) claim based on a proxy that used the lower of two projections prepared by management, like *Azar*, this was done after a favorable quarter. *Envision*, 2019 WL 3494407 at *5. As the magistrate judge observed, there was no meaningful change during the time period between the preparation of the two projections. *Id.* That is not the case here. For that reason, *Envision,* like *Azar*, is unhelpful to Golub.

17

the Updated Case C Projections were unduly pessimistic by assuming $96.1 million in Q4 2017 revenues; and (d) the Case B Projections represented a more accurate portrayal of Gigamon's operative reality. *Id.*

But as I discussed in my previous order:

> That Gigamon would later announce that it had a "record-setting" close in 2017 and that it had maintained its momentum with its customer base does not, without more, create an inference that the Gigamon Defendants knew that relying on the Updated Case C Projections constituted a misrepresentation of the value of the company. Compl. at ¶¶ 136-37. It does not necessarily follow that Gigamon's weak Q2 and Q3 2017, followed by a presumably successful Q4 2017, boded well for the company's long term prospects. To infer that would constitute a claim of "fraud by hindsight," precisely what the PSLRA safe harbor is designed to guard against. *FEI*, 289 F. Supp. 3d at 1171-72 ("fraud by hindsight suits are not meaningfully different from [claims under Section 14(a) because] [i]n both cases, a company makes a purportedly inaccurate forward-looking statement that induces plaintiffs to act to their detriment") (internal quotation marks omitted). Golub has not alleged that there is a misrepresentation baked into the Updated Case C Projections that would render the Gigamon Defendant's Proxy a present statement outside the PSLRA's safe harbor requirement.
>
> . . .
>
> [T]he Updated Case C Projections as described in the Proxy Statement did not fail to incorporate the assumption of a "record-setting close" for 2017 and that even under the Updated Case C Projection, Gigamon was expected to have a record-setting close. Gigamon MTD at 16-17. The Updated Case C Projections estimated revenues of $314 million, a new record for yearly revenues (in 2016 and 2015 Gigamon brought in $311 million and $222 million, respectively). *Id.*; Proxy Statement at 58. Additionally, the Updated Case C Projections also assumed record-setting revenues for Q4 2017of $96.105M, which was $11 million higher than Gigamon's prior best quarter. *Id.*[6] Given that the Updated Case C Projections still predicted a record setting fiscal year and fourth quarter, the Updated Case C Projections cannot be said to be objectively false in light of the May 3, 2018 press release.

Order at 17, 20-21. Therefore, failure to include that Gigamon was concluding a very successful Q4 2017 cannot be said to be material because the Updated Case C Projections would still support this conclusion. Golub has failed to state an omissions claim.

### 3. Falsity of the Updated Case C Projections

As discussed extensively in the Order, the above rationale also applies to why Golub has failed to allege facts that show the Updated Case C Projections were false or misleading. Order at 19-22. That Gigamon issued a press release on July 2, 2018 stating that its market share expanded does not change this result. As Gigamon points out, Golub previously alleged that Gigamon's market share grew by 6 points in 2016 to reach 36% (CC ¶ 90), but grew just one point in 2017 to reach 37%. MTD at 15-16 (citing CC ¶ 90; AC ¶ 87.7).[7] This still suggests that Gigamon's growth slowed in 2017 and provides no basis to infer that its fortunes dramatically turned around in Q4 2017 and 2018.

### B. The Section 20(a) Claims

"Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation[.]" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). As before, because Golub has failed to state a claim for a primary violation under Section 14(a), there can be no control person liability under Section 20(a) against Hooper and or the individual defendants. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) ( to state a Section 20(a) claim, a plaintiff must allege both "a primary violation of the federal securities law" and "that the defendant exercised actual power or control over the primary violator.")

---

[7] Although Golub did not list Gigamon's 2016 market share in the amended complaint, a court may "look to prior pleadings to determine the plausibility of an amended complaint." *Royal Primo Corp. v. Whitewater W. Indus., Ltd*, No. 15-cv-04391-JCS, 2016 WL 4080177, at *6 (N.D. Cal. July 29, 2016) (citing *Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015)).

19

## CONCLUSION

Golub has largely failed to address the reasoning in the prior Order. Gigamon's motion to dismiss is granted without leave to amend.

**IT IS SO ORDERED.**

Dated: September 3, 2019



William H. Orrick
United States District Judge